UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re: | Chapter 7 |
| MARGARITA ONASSIS PARLIONAS<br>a/k/a MARGARITA MARY VEKRAKOS, | Case No. 1-23-42029-jmm<br>Hon. Jil Mazer-Marino |
| Debtor. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**NOTICE OF MOTION TO ENFORCE THE AUTOMATIC STAY, TO HOLD MARIA COFFINAS, ESQ., COFFINAS & LUSTHAUS, P.C., AND ATHANASIOS PARLIONAS IN CIVIL CONTEMPT, FOR INJUNCTIVE RELIEF, AND FOR DAMAGES UNDER 11 U.S.C. § 362(k)**

PLEASE TAKE NOTICE that, upon the annexed Affirmation of Karamvir Dahiya, Esq., dated August 21, 2026; the Memorandum of Law in support of the Motion, dated August 21, 2026; the Affidavit of Margarita Onassis Parlionas, sworn to August 21, 2026, together with Exhibits 1 through 14 annexed thereto; the Affidavit of Evangelia Andreone, sworn to August 19, 2026; the Affidavit of Doreen Mohammed, sworn to August 20, 2026; and all prior pleadings and proceedings had herein, Margarita Onassis Parlionas, the debtor herein (the "Debtor"), by her attorneys, Dahiya Law Offices LLC, will move this Court before the Honorable Jil Mazer-Marino, Chief United States Bankruptcy Judge, on September 22, 2026 at 11:00 a.m. (the "Hearing"), or as soon thereafter as counsel may be heard, for an order:

(a) declaring and confirming that the automatic stay of 11 U.S.C. § 362(a) is, and at all times since June 7, 2023 has been, in effect in this case, no discharge having been granted or denied and this case being neither closed nor dismissed, 11 U.S.C. § 362(c)(2), and conversion having worked no change, 11 U.S.C. § 348(a);

(b) declaring and confirming that no order of this Court has granted Athanasios Parlionas, or any person acting on his behalf, relief from the automatic stay;

(c) determining that the fine of $252,500.00 and the related counsel-fee award of $5,000.00 imposed upon the Debtor by Final Order dated June 16, 2022 and entered June 21, 2022 (Mot. Seq. 16, NYSCEF Doc. No. 461) constitute a

prepetition claim within the meaning of 11 U.S.C. §§ 101(5) and 101(12), the collection of which is stayed by 11 U.S.C. § 362(a)(1), (a)(2) and (a)(6);

(d) determining that the homestead-exemption proceeds in the amount of $179,975.00 paid over to the Debtor by the Chapter 7 Trustee following the February 28, 2025 sale of 157-22 Powells Cove Boulevard are property exempted under 11 U.S.C. § 522(b) and, by force of 11 U.S.C. § 522(c), are not and never were liable for that prepetition claim, and that no demand may be made upon the Debtor to account for or to pay over those proceeds in satisfaction of it;

(e) holding Maria Coffinas, Esq., Coffinas & Lusthaus, P.C., and Athanasios Parlionas, and each of them, in civil contempt of this Court pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9020 for violating the automatic stay and this Court's Orders Remanding Case entered October 12, 2023 and December 5, 2023 in Adversary Proceeding No. 1-23-01067-jmm [ECF Nos. 18, 19];

(f) awarding the Debtor, pursuant to 11 U.S.C. § 362(k)(1), her actual damages, including costs and attorneys' fees, and punitive damages, in amounts to be determined at a further hearing;

(g) enjoining and restraining Maria Coffinas, Esq., Coffinas & Lusthaus, P.C., and Athanasios Parlionas, together with their agents, employees, partners, associates, successors and attorneys, from seeking, requesting, urging, supporting, consenting to, or accepting the benefit of any warrant of arrest, order of commitment, incarceration, money judgment, income execution, restraint, levy, turnover, accounting, or any other act to collect or enforce the June 2022 fine or any other prepetition claim against the Debtor or against the Debtor's exempt property, in the Divorce Action or elsewhere, until further order of this Court;

(h) directing that, within three (3) business days of entry of the order, Maria Coffinas, Esq. and Coffinas & Lusthaus, P.C. (i) file a copy of this Court's order on the NYSCEF docket in the Divorce Action, (ii) withdraw any pending application or

request for relief inconsistent with the foregoing, and (iii) advise the Justice presiding in the Divorce Action, on the record at the next appearance, of the entry and effect of this Court's order;

(i) declaring void, as against the Debtor, all acts heretofore taken in violation of the automatic stay; and

(j) granting such other and further relief as this Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that the Hearing will be conducted by videoconference on Zoom for Government (zoomgov.com). All parties and their professionals who wish to appear at the Hearing — whether by video, by telephone, or otherwise — MUST register in advance through the Court's eCourt Appearances platform, available at www.nyeb.uscourts.gov. Connection details are distributed by the Court approximately forty-eight (48) hours before the Hearing; those registering within forty-eight (48) hours of the Hearing should allow up to fifteen (15) minutes to receive them. Participants who have not registered may have their connections terminated. Any participant unable to access eCourt Appearances must contact the courtroom deputy by e-mail at JMM_Hearings@nyeb.uscourts.gov at least two (2) business days before the Hearing, providing his or her name, the case number, whom he or she represents, the hearing date, and a telephone number.

PLEASE TAKE FURTHER NOTICE that objections or responses to the Motion, if any, must be in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of New York, must set forth the basis for the objection with particularity, and must be filed with the Court electronically and served upon the undersigned so as to be received no later than September 15, 2026 at 4:00 p.m. (prevailing Eastern Time) [seven days before the Hearing; confirm against E.D.N.Y. LBR 9013-1].

PLEASE TAKE FURTHER NOTICE that if no objection or response is timely filed and served, the Court may grant the relief requested in the Motion without further notice or hearing.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and all supporting papers are available on the Court's CM/ECF system at ecf.nyeb.uscourts.gov and, upon written request to the undersigned, will be provided without charge.

Dated: August 21, 2026
New York, New York

DAHIYA LAW OFFICES LLC

/s/ Karamvir Dahiya
Karamvir Dahiya, Esq.
111 John Street, Suite 1860
New York, New York 10038
Tel.: (212) 766-8000
Email: karam@dahiya.law
Attorneys for the Debtor

TO:

- Maria Coffinas, Esq., Coffinas & Lusthaus, P.C., 186 Joralemon Street, Suite 701, Brooklyn, New York 11201 (Mcoffinas@coflus.com);
- Athanasios Parlionas, c/o Coffinas & Lusthaus, P.C. (Fed. R. Bankr. P. 7004(b)(1));
- Debra Kramer, Esq., Chapter 7 Trustee, through her counsel;
- Office of the United States Trustee for Region 2, Brooklyn, New York;
- Terrence J. Worms, Esq. (wormsesq@gmail.com), assigned counsel to the Debtor on the contempt in the Divorce Action; and
- All parties having requested notice pursuant to Fed. R. Bankr. P. 2002.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x**

| | |
|---|---|
| **In re:** | **Chapter 7** |
| **MARGARITA ONASSIS PARLIONAS a/k/a MARGARITA MARY VEKRAKOS,** | **Case No. 1-23-42029-jmm**<br>**Hon. Jil Mazer-Marino** |
| **Debtor.** | |

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x**

**AFFIRMATION OF KARAMVIR DAHIYA, ESQ. IN SUPPORT OF THE DEBTOR'S MOTION TO ENFORCE THE AUTOMATIC STAY, TO HOLD MARIA COFFINAS, ESQ., COFFINAS & LUSTHAUS, P.C., AND ATHANASIOS PARLIONAS IN CIVIL CONTEMPT, FOR INJUNCTIVE RELIEF, AND FOR DAMAGES UNDER 11 U.S.C. § 362(k)**

KARAMVIR DAHIYA, an attorney duly admitted to practice before this Court, affirms the following to be true under penalty of perjury pursuant to 28 U.S.C. § 1746:

## PRELIMINARY STATEMENT

1. I am the principal of Dahiya Law Offices LLC, counsel to Margarita Onassis Parlionas, the debtor herein (the "Debtor"). I submit this affirmation in support of the Debtor's motion (the "Motion") to enforce the automatic stay; to hold Maria Coffinas, Esq. and Coffinas & Lusthaus, P.C. (together, the "Coffinas Firm") and Athanasios Parlionas ("Mr. Parlionas," and with the Coffinas Firm, the "Respondents") in civil contempt of this Court; to restrain the Respondents from further pressing for the Debtor's incarceration on a prepetition debt; and for damages under 11 U.S.C. § 362(k).

2. The purpose of this affirmation is to place the factual record before the Court. The legal argument in support of the Motion is set out in the accompanying Memorandum of Law, filed herewith, and is not repeated here.

3. The Motion is narrow, and I want to state at the outset what it does not seek. It does not ask this Court to enjoin the Supreme Court of the State of New York, County of Queens (the "State Court"). It does not ask this Court to interfere with the matrimonial trial, with the dissolution of the marriage, with equitable distribution, or with the establishment of domestic support obligations — all of which this Court remanded to the State Court and all of which may proceed. It does not ask this Court to revisit the merits of the June 2022

contempt adjudication. And it does not contend that the seven days the Debtor served at Rikers Island in May 2026 on a separate summary contempt for recording a proceeding violated the automatic stay; that conduct was postpetition and was not debt collection, and the Debtor does not conflate the two. Nor does it ask this Court to decide whether the October 2018 transfer of the Debtor's interest in YoYo Lip Gloss, Inc. was a fraudulent conveyance — a question now pending in this Court in the Chapter 7 Trustee's own adversary proceeding, and on which the Debtor concedes nothing.

## I. THE RECORD BEFORE THE COURT

4. I am familiar with the matters set forth herein from my representation of the Debtor, my review of the docket of this Court and of Adversary Proceeding Nos. 1-23-01067-jmm, 1-24-01059-jmm and 1-25-01022-jmm, and my review of the NYSCEF docket and the certified transcripts in *Parlionas v. Parlionas*, Index No. 721778/2020 (Sup. Ct., Queens Cty.) (the "Divorce Action"), pending before the Hon. William A. Viscovich, J.S.C.

5. The Motion rests on three sworn submissions and a documentary record, which I respectfully ask the Court to read together:

6. (a) The Affidavit of Margarita Onassis Parlionas, sworn to August 21, 2026 (the "Parlionas Affidavit"), to which Exhibits 1 through 15 are annexed. Wherever the Debtor describes what was said in court, she quotes the certified transcript rather than her recollection, and where she does not, she says so.

7. (b) The Affidavit of Evangelia Andreone, sworn to August 19, 2026 (the "Andreone Affidavit"), the Debtor's daughter, with whom she lives, going to the effect of the threatened and actual incarceration.

8. (c) The Affidavit of Doreen Mohammed, sworn to August 20, 2026 (the "Mohammed Affidavit"). Ms. Mohammed is not a party to this case or to the Divorce Action and has no financial interest in the outcome of either. She is an acquaintance of the Debtor who has attended the trial to offer moral support while the Debtor proceeds *pro se*, and who has assisted her with note-taking. She attended four sessions in August 2026, seated in the gallery as a member of the public, and took contemporaneous notes, which she retains and is prepared to produce. (Mohammed Aff. ¶¶ 1–4, 19.)

9. (d) Exhibits 1 through 15, comprising the June 2022 Final Order with Notice of Entry (Ex. 1); the August 8, 2022 e-mail from chambers (Ex. 2); the Debtor's schedules including Schedule C (Ex. 3); this Court's Order Remanding Case (Ex. 4); the State Court's Decisions and Orders on Motion Sequences 23 and 33 (Exs. 5–6); the Order Converting Case to Chapter 7 (Ex. 7); the certified transcripts of May 18, 19, 20, 21 and 27, 2026 (Exs. 8–12); the Coffinas Firm's letter to the State Court of May 19, 2026 (Ex. 13); the Order of Commitment of May 27, 2026 (Ex. 14); and the complaint of the Chapter 7 Trustee in *Kramer v. Andreone*, Adv. Pro. No. 1-25-01022-jmm (Ex. 15).

10. Where the Motion relies on a statement made in court for which no transcript has yet been obtained — principally the appearances of August 10, 11, 12, 17 and 18, 2026 — it is supported by the Mohammed Affidavit or, where the Debtor heard it herself, by the Parlionas Affidavit, and is identified as such. Certified transcripts of those dates have been ordered and I will supplement the record upon receipt.

## II. THE BANKRUPTCY CASE

11. The Debtor filed her voluntary petition on June 7, 2023. The case was converted to Chapter 7 on March 18, 2024. (Ex. 7.) Conversion did not terminate the stay. 11 U.S.C. § 348(a).

12. The case is open. It has not been dismissed. No discharge has been granted, and none has been denied. Under 11 U.S.C. § 362(c)(2) the stay of acts other than acts against property of the estate continues until the earliest of the closing of the case, its dismissal, or the time a discharge is granted or denied. None of those has occurred.

13. No party has ever moved this Court for relief from the automatic stay to enforce the June 2022 fine, and no such relief has ever been granted. I have reviewed the docket and confirm this.

14. To the contrary, this Court twice declared the stay in effect as to the enforcement of claims adjudicated in the Divorce Action. (Ex. 4.) And the State Court twice so held: by Decision and Order dated January 3, 2024 and entered January 4, 2024 (Mot. Seq. 23, NYSCEF Doc. No. 837), it denied Mr. Parlionas an immediate warrant for the Debtor's arrest and commitment, a money judgment of $252,500.00 under DRL § 244, and a money judgment of $5,000.00 in counsel fees, "as stayed by plaintiff's bankruptcy filing" (Ex. 5); and the following day, on Motion Sequence 33 (NYSCEF Doc. No. 838), it held that enforcement

of a $15,600.00 counsel-fee award "is stayed pursuant to plaintiff's bankruptcy filing" (Ex. 6).

15. Those orders were entered on the applications of these very Respondents, seeking these very forms of relief. They were served with them. Nothing has changed since.

## III. THE JUNE 2022 CONTEMPT AND THE FINE

16. By Final Order dated June 16, 2022 and entered June 21, 2022 (Mot. Seq. 16, NYSCEF Doc. No. 461), the State Court adjudged the Debtor in civil contempt under Judiciary Law § 772 for transferring her interest in YoYo Lip Gloss, Inc. in violation of the automatic orders, and imposed a fine consisting of the actual loss — the value of that interest — together with $5,000.00 in counsel fees. (Ex. 1.) The Debtor was given the opportunity to purge by paying the counsel fees and placing the principal sum in her attorney's escrow account or posting a bond, or by demonstrating, through competent admissible evidence, that she was unable to do so.

17. The contempt was adjudicated on June 16, 2022 and the Final Order was entered on June 21, 2022. The Debtor filed her voluntary petition almost a year later, on June 7, 2023.

## IV. THE DEBTOR'S APPLICATION TO PURGE HAS NEVER BEEN DECIDED

18. On August 5, 2022 the Debtor filed her showing of inability under the purge provision of the Final Order (NYSCEF Docs. 477–486), and supplemented it on August 12, 2022 (NYSCEF Docs. 509–516). On August 8, 2022, chambers advised counsel that "Justice Viscovich will address all issues at the time of trial." (Ex. 2.) The application was never decided. The State Court's own Decision and Order of January 3, 2024 recites that the Debtor had "filed numerous exhibits demonstrating her alleged inability to purge her contempt," and does not decide the question. (Ex. 5.)

19. Four years on, no court has determined whether the Debtor is or was able to pay the fine.

20. Nor could it be made on this record. The Debtor's monthly operating reports in the Chapter 11 case, filed under penalty of perjury for the nine months from June 2023 through February 2024, each report gross income of $0.00 and total assets of $0.00, with month-end cash of $600, $221, $554, $57, $216, $135, $105, $371 and $197. (Parlionas Aff. ¶ 34.)

The homestead proceeds are spent. The Debtor is 66 years old, lives with her daughter, and is trying a complex financial case against counsel, by herself.

## V. THE HOMESTEAD EXEMPTION AND WHAT BECAME OF THE PROCEEDS

21. On June 16, 2023 the Debtor claimed the New York homestead exemption on Schedule C. (Ex. 3, at pp. 14–15 of that exhibit.) No objection to that exemption was sustained. The exemption is allowed. 11 U.S.C. § 522(l).

22. The Chapter 7 Trustee sold 157-22 Powells Cove Boulevard on February 28, 2025 and paid the exempt amount over to the Debtor. She received $179,975.00. (Parlionas Aff. ¶¶ 28–29.)

23. The homestead proceeds have been spent. Between May 2, 2025 and August 13, 2026, $179,669.74 of the $179,975.00 was disbursed from the escrow account of the Law Offices of Steven Zakharyayev, leaving a balance of $305.26. The disbursements went to legal fees, professional fees, medical bills and settlements, transcripts, and living expenses. (Parlionas Aff. ¶ 29.) The escrow attorney has produced a ledger and reconciliation, which the Debtor will supply on request. She did not conceal these funds; she lived on them and litigated with them while defending a divorce trial *pro se*.

## VI. THE MAY 2026 PROCEEDINGS IN THE DIVORCE ACTION

24. The State Court's statements about the object of the contempt enforcement appear in the certified transcripts. On May 18, 2026 it observed that entering a money judgment would have "probably very little value … because you have declared bankruptcy. You may wind up getting that judgment discharged. As such, my only alternative maybe to have you incarcerated." (Ex. 8, Tr. at 4:19–24.) It told the Debtor she would "remain in jail until you paid." (*Id.* at 9:13–16.) It offered to reduce the purge amount to $125,000.00 — "So I hope you have 125." (*Id.* at 10:16–18.) It described bringing her back to court every six months. (*Id.* at 7:4–9.) On May 27, 2026 it said: "it has become clear to this Court that the money part of it doesn't seem to affect you … so I think the only thing I can do to prove a point is to incarcerate you." (Ex. 12, Tr. at 6:7–12.)

25. Ms. Coffinas has appeared in the Divorce Action throughout. She stated on the record that she has been present "at every single court appearance since the commencement of this

case." (Ex. 8, Tr. May 18, 2026 at 11:6–8.) She litigated Motion Sequences 23 and 33 and received the January 3 and 4, 2024 orders denying her client the very relief she has since resumed seeking, on the express ground that it was stayed.

26. On May 18, 2026 the State Court raised the June 2022 contempt. Ms. Coffinas confirmed the amount as $252,500.00 and stated that no part of it had been restored. (*Id.* at 3:8–23.) Asked whether an Affirmation of Non-Compliance had been filed, she said she could not recall; later the same day she answered, "I think so." (*Id.* at 3:24–4:2, 8:9–11.)

27. Asked whether the bankruptcy court, or any court of higher jurisdiction, had in any way stayed the contempt order or that court's ability to act on it, she answered: "I'm not aware of that, Your Honor." (*Id.* at 5:13–17.) There followed this exchange:

> MS. COFFINAS: That is correct. There was an initial stay issued when Mrs. Parlionas first filed the bankruptcy. To my knowledge, there is no order currently in effect which prevents the Court from following through with the contempt finding. THE COURT: Has the stay been lifted? MS. COFFINAS: As far as I know, yes. THE COURT: You will confirm that? MS. COFFINAS: I will confirm that.

28. (*Id.* at 5:22–6:6.) The stay had not been lifted. It was in effect that day, it had been in effect continuously since June 7, 2023, and it is in effect now.

29. The State Court then stated: "I'm being told that there's no longer a stay in effect but we're going to confirm that because if there is, I would not dare lock you up." (*Id.* at 7:18–21.) It directed Ms. Coffinas to confirm by the following day whether a stay was in effect on its contempt order, and whether she had filed an Affirmation of Non-Compliance. (*Id.* at 8:5–12.)

30. I have read the certified transcripts of May 19, May 20 and May 21, 2026. (Exs. 9–11.) They contain no statement by Ms. Coffinas addressing the status of the automatic stay, and no confirmation of the kind the State Court directed. The correction was never made.

31. What Ms. Coffinas did do, at 10:04 a.m. on May 19, 2026 — the morning after that direction — was file a letter in the Divorce Action transmitting an order of this Court dated May 1, 2026 entered in Adversary Proceeding No. 1-24-01059-jmm. (Ex. 13, NYSCEF Doc. No. 892.) That adversary proceeding concerns the Debtor's interest in YoYo Lip Gloss, Inc. — the same interest on which the June 2022 fine was measured. She was therefore in this Court's orders, and on this Court's docket, on the very morning she had

been directed to report on the stay. She reported the order that helped her client and not the stay that constrained him.

32. On May 21, 2026 Ms. Coffinas asked the State Court to adjudicate the Debtor in criminal contempt. (Ex. 11, Tr. at 138:17–22; see also 139:8–15, 140:10–19.) She did so after being told, on the record, "You are not part of the summary contempt proceeding here. So, quite frankly, you don't have an official position in what I'm doing here" (*id.* at 138:10–13), and was told again, "you really don't have a position here … You are not the prosecutor. There's no prosecutor in this case" (*id.* at 139:16–24).

33. On May 27, 2026 the State Court declined the request. (Ex. 12, Tr. at 5:8–9, 9:20–21.) The significance of the request for present purposes is not that it succeeded — it did not — but that it was made: a creditor's counsel, knowing of the bankruptcy, sought to have the debtor's liability recharacterized in a way calculated to place the proceeding outside § 362(a) and within § 362(b)(1).

## VII. THE AUGUST 2026 PROCEEDINGS

34. At the appearance of August 10, 2026 the State Court directed the Debtor to apply approximately $180,000 to the contempt fine. She does not have those funds. She was present at that appearance and states this from what she heard, not from a transcript. (Parlionas Aff. ¶ 30.)

35. In August 2026 the amount was named. On August 17, 2026 the State Court referred to the Debtor being "held in contempt of $180,000," said it did not want her held, and told her: "please please please meet with your lawyer to find $180,000" — a reference, as the observer records, to the homestead money paid to her on the sale of her house. (Mohammed Aff. ¶ 13.)

36. The Mohammed Affidavit establishes that the threat is current. On four dates in August 2026 an observer present in the courtroom recorded the State Court telling the Debtor that she could be locked up (Aug. 11, ¶ 6; Aug. 12, ¶ 9); that she was "getting closer to getting locked up" (Aug. 17, ¶ 12); that she should "find $180,000" (Aug. 17, ¶ 13); that her contempt "may be active" and she "may be locked up on Monday, August 24, 2026" (Aug. 18, ¶ 17); and that "there is a chance that you will be locked up," with the advice that she not bring anything of value with her (Aug. 18, ¶ 18). The same entry records that the State

Court stated that the contempt finding "arose out of her transfer of shares in Yoyo Lip Gloss" from her own name into her daughter's, and that it had given her thirty days "either to restore the shares or to place money in escrow." (*Id.* ¶ 18.)

37. Certified transcripts of the appearances of August 10, 11, 12, 17 and 18, 2026 have been ordered. I will supplement the record upon receipt.

## VIII. THE MAY 27, 2026 INCARCERATION AND WHAT HAS FOLLOWED

38. The threat here is imprisonment, and it is neither abstract nor remote. This Debtor has already been jailed once in this litigation. On May 27, 2026, appearing without counsel and having been told "I don't believe you are destitute, ma'am" when she asked for assigned counsel, she was found to have violated Civil Rights Law § 52, sentenced to seven days, and remanded. (Ex. 12, Tr. at 4:4–8, 5:17–20, 12:1–16; Ex. 14; Parlionas Aff. ¶¶ 36–41; Andreone Aff. ¶¶ 8, 11.) She served all seven days at Rikers Island.

39. The Debtor does not contend that the May 2026 recording contempt violated the automatic stay, and this Motion seeks no relief as to it. It matters here for two reasons only. First, it establishes that the threat of incarceration in this litigation is real, because it has already been carried out. Second, it is the source of the harm the continuing collection threats now aggravate — which is a component of the Debtor's actual damages under § 362(k).

40. On the effect of that incarceration the Andreone Affidavit is specific and restrained. The Debtor's daughter, with whom she lives and sees daily, describes what changed after May 27, 2026 and distinguishes it from what preceded: the vomiting, the waking at night, and the therapy all began after Rikers Island; the fatigue and difficulty concentrating date to a February 2023 head injury and are not attributed to this year. (Andreone Aff. ¶¶ 13–26.) She states expressly that she is not suggesting the Debtor is incompetent and seeks no appointment for her; the point is narrower — that the Debtor "is frightened to the point where she cannot make use of what she has," and that this "would ease if the threat of jail were lifted from her." (*Id.* ¶¶ 28–29.)

## IX. THE CHAPTER 7 TRUSTEE'S PENDING ADVERSARY PROCEEDING

41. On March 8, 2025 Debra Kramer, solely as Chapter 7 Trustee of the Debtor's estate, commenced an adversary proceeding in this Court against Evangelia Andreone, the

Debtor's daughter. *Kramer v. Andreone*, Adv. Pro. No. 1-25-01022-jmm [ECF No. 1] (the "Trustee's Action"). A copy of the complaint is annexed as Exhibit 15. The proceeding is pending.

42. The Trustee seeks to avoid and to recover the Debtor's transfer, on or about October 1, 2018, of her remaining 25% interest in YoYo Lip Gloss, Inc. to Ms. Andreone. She pleads seven claims for relief under 11 U.S.C. §§ 544, 550 and 502(d) and sections 273, 274, 275, 276 and 276-a of the New York Debtor and Creditor Law, and she values the transferred interest at $252,500.00. (Ex. 15, ¶¶ 1, 9, 11, 28–31, 48–88.)

43. That is the same transfer, of the same shares, in the same amount as the fine imposed by the June 2022 Final Order. The Trustee pleads it from the same source: she annexes the Contempt Order of June 21, 2022 to her complaint as her own Exhibit A, and quotes its findings. (Ex. 15, ¶¶ 3–4, 33–36, 46, 72–73.)

44. I place this on the record because of what it establishes about forum, and for no other purpose. The Debtor does not concede that the October 2018 transfer was a fraudulent conveyance, and she does not concede that the Trustee's claims are well founded. She intends to move to dismiss the Trustee's Action, and she reserves every argument available to her there. Nothing in the Motion, and nothing in the accompanying Memorandum of Law, is intended as or should be taken as a concession on that question.

## X. WHAT THE DEBTOR DOES AND DOES NOT CONTEND

45. I state plainly, and in one place, the limits of what is asserted. The Debtor does not contend that the State Court lacks jurisdiction over the divorce; it plainly has it, and this Court remanded those issues to it. She does not contend that the State Court lacks power to punish a contempt committed in its presence. She does not ask this Court to review, reverse, or sit in appeal of any judgment of the State Court, and she seeks no relief against Justice Viscovich. And she does not contend that the summary contempt of May 21, 2026, or the seven days she served on it, violated the automatic stay. Nor does she ask this Court to decide whether the October 2018 transfer was a fraudulent conveyance, or to disturb the Trustee's Action; she asks only that the question be decided in the forum Congress designated, and that no one be imprisoned while it remains open.

46. What she contends is narrower. The Respondents — a private creditor and his counsel, both before this Court and both bound by a federal injunction — have for more than two years pressed a state court to imprison her until she pays a prepetition claim, out of a fund this Court exempted and its Trustee disbursed, and which she no longer has. The Motion asks that they be made to stop, and to answer for having done it.

## XI. NO PRIOR APPLICATION

47. No prior application for the relief sought in the Motion has been made to this or to any other court. For completeness, the application of the automatic stay to the Divorce Action has been addressed by this Court in its Orders Remanding Case entered October 12 and December 5, 2023 (Adv. Pro. No. 1-23-01067-jmm [ECF Nos. 18, 19]), and by the State Court in its Decisions and Orders on Motion Sequences 23 and 33. (Exs. 4–6.)

48. WHEREFORE, for the reasons set forth in the accompanying Memorandum of Law, I respectfully request that the Court grant the Motion in all respects, hold the Respondents in civil contempt, restrain them as set forth in the accompanying Notice of Motion and proposed order, award the Debtor her damages, costs and attorneys' fees under 11 U.S.C. § 362(k)(1), and grant such other and further relief as is just and proper.

Dated: August 21 , 2026
New York, New York

DAHIYA LAW OFFICES LLC
*/s/ Karamvir Dahiya*
Karamvir Dahiya, Esq.
111 John Street, Suite 1860
New York, New York 10038
Tel.: (212) 766-8000
Email: karam@dahiya.law
Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re: | Chapter 7 |
| MARGARITA ONASSIS PARLIONAS<br>a/k/a MARGARITA MARY VEKRAKOS, | Case No. 1-23-42029-jmm<br>Hon. Jil Mazer-Marino |
| Debtor. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN SUPPORT OF THE DEBTOR'S MOTION TO ENFORCE THE AUTOMATIC STAY, TO HOLD THE RESPONDENTS IN CIVIL CONTEMPT, FOR INJUNCTIVE RELIEF, AND FOR DAMAGES UNDER 11 U.S.C. § 362(k)**


**DAHIYA LAW OFFICES LLC**
111 John Street, Suite 1860
New York, New York 10038
Tel.: (212) 766-8000
Email: karam@dahiya.law

Attorneys for the Debtor

**TABLE OF CONTENTS**

*In re Margarita Onassis Parlionas*, Case No. 23-42029-jmm (Bankr. E.D.N.Y.) — Memorandum of Law in Support of the Debtor's Motion to Enforce the Automatic Stay, to Hold the Respondents in Civil Contempt, for Injunctive Relief, and for Damages under 11 U.S.C. § 362(k)


**PRELIMINARY STATEMENT** (¶¶ 1–12)........**1**

**STATEMENT OF FACTS** (¶ 13)........**3**

**ARGUMENT**........**3**

**POINT I — THE AUTOMATIC STAY IS IN EFFECT, AND NO RELIEF FROM IT HAS EVER BEEN GRANTED** (¶¶ 14–15)........**3**

**POINT II — THE FINE IS A PREPETITION CLAIM, ITS ENFORCEMENT IS COLLECTION, AND NO EXCEPTION APPLIES** (¶¶ 16–23)........**4**

The fine is a "claim" held by Mr. Parlionas, and it arose prepetition (¶¶ 16–17)........4
Sections 362(a)(1), (a)(2) and (a)(6) protect the Debtor personally (¶ 18)........4
The State Court has said on the record that collection is the object (¶¶ 19–21)........4
No exception applies — § 362(b)(1) and § 362(b)(2) (¶¶ 22–23)........5

**POINT III — THE EXEMPT HOMESTEAD PROCEEDS ARE NOT LIABLE FOR THIS CLAIM, AND THE DEMAND THAT THE DEBTOR ACCOUNT FOR THEM AND PAY THEM OVER IS CONTRARY TO FEDERAL LAW** (¶¶ 24–28)........**6**

The exemption was allowed and the proceeds were paid over by the Trustee (¶ 24).....6
Section 522(c) — a § 523(a)(15) debt is not among the exceptions (¶¶ 25–27)........6
In any event the money is gone: $305.26 remains of $179,975.00 (¶ 28)........7

**POINT IV — THERE IS NO CIVIL CONTEMPT WITHOUT ABILITY TO COMPLY, AND THE DEBTOR CANNOT PURGE** (¶¶ 29–33)........**7**

The keys-in-his-own-pocket principle — *Shillitani*; *Maggio*; *Turner* (¶¶ 29–30)........7
New York is to the same effect — Judiciary Law §§ 770, 774, 775; *El-Dehdan* (¶ 31) 7
The August 2022 purge submission has never been decided (¶¶ 32–33)........8

**POINT V — THE STATE COURT PROCEEDING TRESPASSES ON THIS COURT'S EXCLUSIVE IN REM JURISDICTION** (¶¶ 34–55)........**8**

28 U.S.C. § 1334(e)(1) and the deliberate contrast with § 1334(b) (¶¶ 34–35)........8
The exemption, the sale and the disbursement were all acts of this Court (¶¶ 36–38)…8
The court that first acquires the res — *Princess Lida* and its line (¶¶ 39–42)........9
Congress wrote the principle into the statute — *Hood*, *Katz*, *Celotex* (¶¶ 43–44)........10
The line between adjudicating rights and controlling the res (¶ 45)........12
Acts taken in violation of the stay are void — *Benalcazar*; *Fulton* (¶¶ 46–48)........12
*Williams Natural Gas* and the two ends of *Rooker*; *Gruntz* (¶¶ 49–51)........13
*Kalb v. Feuerstein*, and the settled rule in this Circuit (¶¶ 52–53)........16
What this argument does not claim; comity is not a one-way ratchet (¶¶ 54–55)........16

**POINT VI — THE LEADING TREATISE CONFIRMS THAT EVERY ACT COMPLAINED OF IS STAYED** (¶¶ 56–71)....................**17**
The breadth of the stay; civil arrest and post-judgment remedies (¶¶ 56–59)....................17
Exempt property remains protected against prepetition creditors (¶ 60)....................18
Contempt proceedings as collection — the cases *Collier* gathers (¶ 61)....................19
The exceptions are narrow — § 362(b)(1) and § 362(b)(2) (¶¶ 62–63)....................20
The duty to speak, and the consequence of silence (¶¶ 64–65)....................20
Acting at one's peril (¶ 66)....................21
Who decides the scope of the stay (¶ 67)....................21
Void, contempt, and the duty to undo (¶¶ 68–69)....................22
Damages, and the *Taggart* qualification (¶¶ 70–71)....................22

**POINT VII — THE RESPONDENTS' VIOLATIONS ARE WILLFUL; CONTEMPT LIES UNDER § 105(a); DAMAGES LIE UNDER § 362(k)** (¶¶ 72–88)....................**23**
The affirmative duty to stop a collection effort already in motion (¶ 72)....................23
*Valentine* and *Wohleber* on these facts; the excuses already rejected (¶¶ 73–76)........24
Willfulness in this Circuit; no malice or specific intent required (¶ 77)....................25
Counsel's knowledge is imputed; principal and agent are jointly liable (¶ 77)....................25
*Taggart* and *Windstream*: no fair ground of doubt on this record (¶¶ 78–79)....................26
Section 362(k)(1) — the scope of recoverable fees and the right to a hearing (¶ 80)...27
Emotional-distress damages; no medical corroboration required (¶ 81)....................28
The showing on this record — the Andreone and Parlionas Affidavits (¶¶ 82–87).....31
Punitive damages, including against counsel personally (¶ 88)....................32

**POINT VIII — INJUNCTIVE RELIEF IS NECESSARY AND IS NARROWLY DRAWN** (¶¶ 89–92)....................**34**

**POINT IX — THE CHARACTERIZATION OF THE 2018 TRANSFER IS PENDING IN THIS COURT, IN THE TRUSTEE'S OWN ADVERSARY PROCEEDING; ON EITHER CHARACTERIZATION THE STATE COURT MAY NOT EXTRACT ITS VALUE, AND ON NEITHER MAY THE DEBTOR BE IMPRISONED** (¶¶ 93–107)....................**35**
The Trustee's pending adversary proceeding, and its exact overlap (¶¶ 93–94)..........35
The Debtor's position reserved; nothing below is a concession (¶¶ 95–96)....................36
First — equitable distribution: § 523(a)(15) and § 522(c) (¶ 97)....................36
Second, *arguendo* — fraudulent conveyance: the claim is the Trustee's (¶ 98)...........37
*Colonial Realty*; *Fidelity Mortgage*; *St. Paul Fire* on standing (¶¶ 99–102)....................37
The inconsistency is the Respondents'; the risk of double payment (¶¶ 103–104)......38
The directive to restore the shares or escrow their value (¶ 105)....................39
Parallel proceedings — *Colorado River*, *Younger*, *Sprint* (¶ 106)....................39
No concurrent jurisdiction to tolerate; the Anti-Injunction Act (¶ 107)....................40

**CONCLUSION** (¶ 108)....................**40**

## PRELIMINARY STATEMENT

1. Margarita Onassis Parlionas, the debtor herein (the "Debtor"), respectfully submits this memorandum of law in support of her motion (the "Motion") to enforce the automatic stay; to hold Maria Coffinas, Esq. and Coffinas & Lusthaus, P.C. (together, the "Coffinas Firm") and Athanasios Parlionas ("Mr. Parlionas," and with the Coffinas Firm, the "Respondents") in civil contempt of this Court; to restrain the Respondents from further pressing for the Debtor's incarceration on a prepetition debt; and for damages under 11 U.S.C. § 362(k).

2. What the Motion seeks is the enforcement of an order this Court has already entered, twice, in words of its own selection: "that the automatic stay is hereby declared and confirmed as being in effect as to the enforcement of claims adjudicated in the Divorce Action against assets of the Bankruptcy Estate." Order Remanding Case, Adv. Pro. No. 1-23-01067-jmm [ECF No. 19] (entered Dec. 5, 2023) (Ex. 4); see also *id.* [ECF No. 18] (entered Oct. 12, 2023).

3. For four years a creditor and his counsel have pursued the Debtor's imprisonment to collect a fine imposed on him as indemnification, before she filed. In January 2024 the State Court itself denied exactly that relief "as stayed by plaintiff's bankruptcy filing." (Ex. 5.) Nothing changed thereafter. No relief from stay was ever sought from this Court, let alone granted.

4. What changed is that on May 18, 2026 the State Court asked counsel a direct question, and got a wrong answer. The Court asked whether the stay had been lifted. Ms. Coffinas answered, "As far as I know, yes," and undertook to confirm it. She never did. The State Court had said, moments earlier, "I'm being told that there's no longer a stay in effect but we're going to confirm that because if there is, I would not dare lock you up." (Ex. 8, Tr. May 18, 2026 at 5:22–6:6, 7:18–21.) On that answer, a course of conduct resumed that this Court's orders had stopped.

5. By August 2026 the State Court was telling the Debtor to "find $180,000" — the homestead exemption this Court's Trustee paid her — and that she was "getting closer to getting locked up." (Mohammed Aff. ¶¶ 12–13.) On August 18, 2026 it told her there was "a chance that you will be locked up" on Monday, August 24, and advised her not to bring anything of value with her. (*Id.* ¶ 18.)

6. Three independent propositions of federal law each independently forbid that result, and together they leave no fair ground of doubt:

7. First, the fine is a prepetition claim. It was entered on June 21, 2022; the petition was filed on June 7, 2023. An act to collect it — including a coercive commitment whose purge is payment to the creditor — is stayed by § 362(a)(1), (a)(2) and (a)(6), which protect the debtor personally and are not confined to estate property.

8. Second, the fund the Debtor is being told to pay it from is exempt. Congress has provided in 11 U.S.C. § 522(c) that exempted property "is not liable during or after the case for any debt of the debtor that arose … before the commencement of the case," subject to exceptions that do not include debts of the kind described in 11 U.S.C. § 523(a)(15). A demand that the Debtor account for her homestead proceeds and apply them to this fine asks her to do what federal law says she need not do, and threatens her with jail for declining.

9. Third, she cannot pay. The homestead money is gone — $305.26 remains of $179,975.00 — and it went to legal fees, professional fees, medical bills, transcripts and living expenses. A civil contempt sanction is coercive by definition; it presupposes that the contemnor "carr[ies] the keys of [his] prison in [his] own pocket[]." One who is unable to comply carries no keys, and imprisoning him is not coercion but punishment. The Debtor filed sworn proof of her inability in August 2022. Four years later, no court has ever ruled on it.

10. The Debtor's sworn account of that submission is specific. The June 2022 Final Order permitted her to purge by demonstrating, through competent admissible evidence, that she was unable to pay. She filed under that route on August 5, 2022 (NYSCEF Docs. 477–486) and supplemented it on August 12, 2022 (NYSCEF Docs. 509–516). On August 8, 2022 chambers advised counsel that "Justice Viscovich will address all issues at the time of trial." The State Court's Decision and Order of January 3, 2024 recites that she had "filed numerous exhibits demonstrating her alleged inability to purge her contempt," and does not decide the question. (Parlionas Aff. ¶¶ 31–33; Exs. 1, 2, 5.)

11. On the merits of ability to pay, the record is one-sided. The Debtor's monthly operating reports for the nine months from June 2023 through February 2024, filed under penalty of perjury, each report gross income of $0.00 and total assets of $0.00, with month-end cash of $600, $221, $554, $57, $216, $135, $105, $371 and $197. (Parlionas Aff. ¶ 34.) The homestead proceeds are spent, leaving $305.26. (*Id.* ¶ 29.) She states without qualification: "I have not been able to pay the $252,500.00 fine at any time since it was imposed." (*Id.* ¶ 35.) She is 66 years old and lives with her daughter. (Andreone Aff. ¶¶ 3–4.)

12. Finally, and independently: a state court proceeding whose object is to extract payment of a prepetition claim out of exempt property adjudicates, in substance, questions this Court alone may decide. 28 U.S.C. § 1334(e)(1) vests exclusive jurisdiction over the property of the debtor as of the commencement of the case, and of property of the estate, in the district court in which the case is pending. Collection contempt of this kind does not merely burden the Debtor; it takes from this Court the administration of the exemption it allowed.

## STATEMENT OF FACTS

13. The facts on which the Motion rests are set forth in the Affirmation of Karamvir Dahiya, Esq., dated August 21, 2026 (the "Dahiya Affirmation"), in the Affidavits of Margarita Onassis Parlionas, Evangelia Andreone and Doreen Mohammed, and in Exhibits 1 through 14 annexed to the Parlionas Affidavit, to all of which the Court is respectfully referred. Exhibit and transcript citations in this memorandum are to those materials. The three affidavits serve distinct purposes and are relied on for distinct propositions. The Debtor's own affidavit supplies the procedural history, the terms of the June 2022 Final Order, her August 2022 purge submission, the disposition of the homestead proceeds, and her account of what has been said to her in court. The affidavit of Evangelia Andreone, her daughter, with whom she lives and who sees her daily, supplies the evidence of harm — and, importantly, distinguishes what changed after May 27, 2026 from what preceded it. The affidavit of Doreen Mohammed, a disinterested member of the public who attended four trial sessions in August 2026 and took contemporaneous notes, supplies the current record of what the State Court has said about incarceration since the last certified transcript.

## ARGUMENT

### POINT I — THE AUTOMATIC STAY IS IN EFFECT, AND NO RELIEF FROM IT HAS EVER BEEN GRANTED

14. Under 11 U.S.C. § 362(c)(2), the stay of any act other than an act against property of the estate continues until the earliest of the closing of the case, its dismissal, or the time a discharge is granted or denied. This case is open and undismissed; no discharge has been granted, and none has been denied. Conversion from Chapter 11 to Chapter 7 worked no

change. 11 U.S.C. § 348(a). No party has ever sought or obtained relief from the automatic stay to enforce the June 2022 fine. (Dahiya Aff. ¶¶ 11–15; Parlionas Aff. ¶¶ 1, 8, 9.)

15. This Court twice declared the stay in effect as to the enforcement of claims adjudicated in the Divorce Action. Order Remanding Case, Adv. Pro. No. 1-23-01067-jmm [ECF Nos. 18, 19] (Ex. 4). The State Court twice so held, denying these very Respondents these very forms of relief "as stayed by plaintiff's bankruptcy filing." (Exs. 5–6.)

## POINT II — THE FINE IS A PREPETITION CLAIM, ITS ENFORCEMENT IS COLLECTION, AND NO EXCEPTION APPLIES

16. A fine imposed under Judiciary Law § 773 to indemnify an aggrieved party is, by the statute's own terms, a sum that "must be imposed upon the offender, and collected, and paid over to the aggrieved party," and its payment and acceptance "constitute a bar to an action by the aggrieved party, to recover damages for the loss or injury." It is a right to payment held by Mr. Parlionas. It is therefore a "claim," 11 U.S.C. § 101(5)(A), and the Debtor's liability on it a "debt," *id.* § 101(12). See *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558–59 (1990).

17. The claim arose prepetition. It was adjudicated on June 16, 2022 and entered on June 21, 2022 — almost a year before the petition. That the coercive enforcement would occur postpetition is immaterial; what matters is when the right to payment arose. The Debtor's affidavit distinguishes the two contempt proceedings and asks that they not be treated as one: the YoYo Lip Gloss money contempt, adjudicated June 16, 2022 and entered June 21, 2022, which "arose before my petition," and the summary recording contempt of May 21, 2026, which "occurred after my petition." (Parlionas Aff. ¶ 5(a)–(b).) Only the first is the subject of this Motion.

18. Sections 362(a)(1), (a)(2) and (a)(6) are not limited to property of the estate. They protect the debtor personally, and § 362(a)(6) reaches "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." The disbursement of the exempt proceeds out of the estate therefore did not narrow the stay's protection of the Debtor herself.

19. That what is being pursued is collection is not a matter of inference; the State Court has said so, repeatedly and on the record. It observed that entering a money judgment would have

"*probably very little value … because you have declared bankruptcy. You may wind up getting that judgment discharged. As such, my only alternative maybe to have you incarcerated*." (Ex. 8, Tr. May 18, 2026 at 4:19–24.) (emphasis provided). It told the Debtor she would "remain in jail until you paid." (*Id.* at 9:13–16.) It offered to reduce the purge amount to $125,000.00 — "So I hope you have 125." (*Id.* at 10:16–18.) It described bringing her back to court every six months. (*Id.* at 7:4–9.) On May 27, 2026 it said: "it has become clear to this Court that the money part of it doesn't seem to affect you … so I think the only thing I can do to prove a point is to incarcerate you." (Ex. 12, Tr. at 6:7–12.) See Parlionas Aff. ¶¶ 12–19, 44–45; Dahiya Aff. ¶ 24.

20. In August 2026 the amount was named. On August 17, 2026 the State Court referred to the Debtor being "held in contempt of $180,000," said it did not want her held, and told her, "please please please meet with your lawyer to find $180,000" — a reference, the observer records, "to the homestead money that she was paid in relation to the sale of her house in Queens." (Mohammed Aff. ¶ 13.) The Debtor's own affidavit corroborates it: at the appearance of August 10, 2026 the State Court directed her to apply approximately $180,000 to the contempt fine, and she does not have those funds. (Parlionas Aff. ¶ 30.) On August 18, 2026 the State Court stated that the contempt "arose out of her transfer of shares in Yoyo Lip Gloss," that she had been given thirty days "either to restore the shares or to place money in escrow," that "there is a chance that you will be locked up," and that the issue was "whether she could have purged her contempt"; it advised her not to bring anything of value with her. (Mohammed Aff. ¶ 18.)

21. The purge is payment to Mr. Parlionas. The fine is his indemnification. The proceeding was commenced on his motion and has been prosecuted by his counsel. Whatever else it is, it is a private collection device, and it is stayed.

22. No exception applies. Section 362(b)(1) excepts the commencement or continuation of a criminal action or proceeding against the debtor. This is not one. The State Court declined to make it one — twice: "His lawyer asked I hold you in criminal contempt; I did not do so. You are in civil contempt," and again, "I am not holding you in criminal contempt, I am holding you in civil contempt." (Ex. 12, Tr. at 5:8–9, 9:20–21; Parlionas Aff. ¶ 27.) I anticipate that the Respondents will invoke *United States v. Colasuonno*, 697 F.3d 164, 173–74 (2d Cir. 2012). *Colasuonno* concerned a probation revocation in a genuine criminal

prosecution brought by the sovereign; it does not reach a private party's application, expressly adjudicated as civil, to be paid.

23. Section 362(b)(2) is likewise unavailable. The fine is not a domestic support obligation within 11 U.S.C. § 101(14A); it is not in the nature of alimony, maintenance or support, but the indemnified value of a transferred business interest — a property-division obligation of the character addressed by § 523(a)(15). It is scheduled as a general unsecured claim, and no domestic support obligation has been asserted.

**POINT III — THE EXEMPT HOMESTEAD PROCEEDS ARE NOT LIABLE FOR THIS CLAIM, AND THE DEMAND THAT THE DEBTOR ACCOUNT FOR THEM AND PAY THEM OVER IS CONTRARY TO FEDERAL LAW**

24. The Debtor claimed the New York homestead exemption on Schedule C; no objection was sustained; and by operation of 11 U.S.C. § 522(l) the property is exempt. The Chapter 7 Trustee sold the property and paid the exempt amount — $179,975.00 — over to her. (Dahiya Aff. ¶¶ 21–23; Parlionas Aff. ¶¶ 28–29; Ex. 3.)

25. Section 522(c) provides that "[u]nless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose … before the commencement of the case," except for debts of a kind specified in § 523(a)(1) or § 523(a)(5), certain secured and tax-lien obligations, certain debts owed by institution-affiliated parties, and debts in connection with fraud in obtaining education financial assistance. A debt of the kind described in § 523(a)(15) is not among the exceptions. Congress created § 523(a)(15) in 1994 and rewrote § 522(c)(1) in 2005, and on neither occasion added it.

26. The consequence is exact. Even assuming the June 2022 fine survives as a nondischargeable property-division debt, it may not be collected out of the Debtor's exempt homestead proceeds. Congress said those proceeds are "not liable" for it.

27. It follows that the premise on which the Debtor is being threatened with jail — that she was obliged to apply the $179,975.00 to the fine, that she must now account for it, and that she stands in contempt for not having done so — is contrary to federal law. She cannot be imprisoned for declining to pay a stayed prepetition claim out of a fund Congress declared not liable for it. The direction of August 10, 2026 that she apply approximately $180,000 to the fine (Parlionas Aff. ¶ 30), and the direction of August 17, 2026 to "find $180,000"

(Mohammed Aff. ¶ 13), each ask precisely that. The observer records that the reference was "to the homestead money that she was paid in relation to the sale of her house in Queens." (*Id.*)

28. There is a further and simpler answer. The money is gone. Between May 2, 2025 and August 13, 2026, $179,669.74 of the $179,975.00 was disbursed from the attorney escrow account of the Law Offices of Steven Zakharyayev, leaving a balance of $305.26. The disbursements went to legal fees, professional fees, medical bills and settlements, transcripts, and living expenses. The escrow attorney has produced a ledger and reconciliation, which the Debtor will supply on request. (Parlionas Aff. ¶ 29; Dahiya Aff. ¶ 23.) She did not conceal these funds; she lived on them and litigated with them while defending a divorce trial *pro se*.

## POINT IV — THERE IS NO CIVIL CONTEMPT WITHOUT ABILITY TO COMPLY, AND THE DEBTOR CANNOT PURGE

29. Civil contempt is coercive, not punitive. Its legitimacy rests on the contemnor's capacity to end it — the contemnor "carr[ies] the keys of [his] prison in [his] own pocket[]." *Shillitani v. United States*, 384 U.S. 364, 368 (1966); accord *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632–33 (1988).

30. Where the contemnor cannot comply, there are no keys, and imprisonment ceases to coerce. The Supreme Court so held in a bankruptcy case: "to jail one for a contempt for omitting an act he is powerless to perform would reverse this principle, and make the proceeding purely punitive." *Maggio v. Zeitz*, 333 U.S. 56, 72 (1948). The court must weigh all the evidence "in determining whether or not there is actually a present ability to comply." *Id.* at 75–76. See also *Hicks*, 485 U.S. at 638 n.9 (punishment may not be imposed in civil contempt where it is "clearly established that the alleged contemnor is unable to comply"); *Turner v. Rogers*, 564 U.S. 431, 442, 446 (2011) (ability to pay is "the critical question").

31. New York law is to the same effect and is, if anything, more explicit. Judiciary Law § 774(1) authorizes coercive imprisonment only where the omitted act or duty "is yet in the power of the offender to perform." Judiciary Law § 770 directs that where the offender satisfies the court that he has "at the time no means or property or income which could be

levied upon," the court "shall deny the application to punish." And Judiciary Law § 775 permits discharge where the offender is "unable … to pay the sum, or perform the act or duty, required." Under *El-Dehdan v. El-Dehdan*, 26 N.Y.3d 19, 35 (2015), once a violation is shown it is "incumbent upon [the contemnor] to proffer evidence of his inability to pay" — which is exactly what the Debtor did, four years ago.

32. The Debtor filed sworn proof of her inability in August 2022, and it has never been decided. (Dahiya Aff. ¶¶ 18–20; Parlionas Aff. ¶¶ 31–33; Exs. 1, 2, 5.) Four years on, no court has ever found that she is able to pay. That finding is the predicate for a lawful commitment, and it does not exist.

33. I make this point in this Court, and not as an invitation to review the State Court's exercise of its own contempt power, for a specific reason: the Respondents' own conduct in pressing for a commitment they know cannot be purged is what converts their applications from permissible advocacy into a willful act to collect a stayed prepetition claim. It bears directly on the contempt and § 362(k) relief sought here.

## POINT V — THE STATE COURT PROCEEDING TRESPASSES ON THIS COURT'S EXCLUSIVE IN REM JURISDICTION

34. There is a dimension to this dispute beyond the stay, and it is the one that ought to *concern this Court most*. What is happening in the Divorce Action is not merely the pursuit of a stayed claim. It is the re-decision, in another forum, of a question that Congress committed to this Court alone, and the nullification of a determination this Court has already made and already executed.

35. Begin with the statute. 28 U.S.C. § 1334(e)(1) provides that "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction … of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." The contrast with § 1334(b) is deliberate: jurisdiction over civil proceedings arising under, arising in, or related to a title 11 case is "original but not exclusive." Jurisdiction over the res is exclusive. State courts may share the former. They have none of the latter.

36. The 157-22 Powells Cove Boulevard property was property of the debtor as of June 7, 2023 and became property of the estate. The homestead exemption in it was claimed in this Court

on Schedule C. (Ex. 3.) No timely objection was sustained, and by operation of 11 U.S.C. § 522(l) the property is exempt. *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642–44 (1992) (absent timely objection, § 522(l) "has made the property exempt," and the exemption may not be contested thereafter "whether or not [the debtor] had a colorable statutory basis for claiming it"; deadlines "produce finality"); accord *Schwab v. Reilly*, 560 U.S. 770, 775–76 (2010).

37. This Court's Trustee then sold the property, and this Court's administration produced the final disbursement of the exempt proceeds to the Debtor on or about February 28, 2025. That disbursement was the last act in a chain of federal determinations — allowance of the exemption, sale, and distribution — every link of which occurred in this Court.

38. What the State Court is now doing is ordering the Debtor to pay those very proceeds over to a prepetition creditor on pain of imprisonment. "[P]lease please please meet with your lawyer to find $180,000." (Mohammed Aff. ¶ 13.) That is not an adjudication of the divorce. It is a determination that funds this Court declared exempt and disbursed are available to satisfy a prepetition debt — the precise question 11 U.S.C. § 522(c) answers, in the negative, and the precise res over which § 1334(e)(1) gives this Court exclusive jurisdiction.

39. That conclusion does not rest on the Bankruptcy Code alone. It rests on a principle older than the Code — older than the Judiciary Act's modern form — that where two courts would both need control of the same property, only one of them may have it.

40. The rule is that jurisdiction over a res belongs to the court that first acquires control of it. "Jurisdiction of the res is obtained by a seizure under process of the court, whereby it is held to abide such order as the court may make concerning it." *Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 317 (1870). And once that jurisdiction attaches it is not defeated by a later change in who physically holds the property: "We do not understand the law to be that an actual and continuous possession of the res is required to sustain the jurisdiction of the court." *The Rio Grande*, 90 U.S. (23 Wall.) 458, 461 (1874); see *id.* at 463–64 (quoting Cooper).

41. The Supreme Court has applied that rule to precisely the situation of two courts, one federal and one state, whose orders would collide over the same fund. "[I]f the two suits are *in rem*, or quasi *in rem*, so that the court, or its officer, has possession or must have control of the

property which is the subject of the litigation in order to proceed with the cause and grant the relief sought, the jurisdiction of the one court must yield to that of the other." *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The principle, the Court added, "is not restricted to cases where property has been actually seized under judicial process before a second suit is instituted, but applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property." *Id.* at 466–67.

42. I note for the Court's benefit — because the point cuts both ways and I would rather state it than have it stated for me — that the doctrine is symmetrical, and that in *Princess Lida* it was the state court that had first assumed jurisdiction and the federal court that was required to yield. That is the doctrine's strength, not its weakness. It does not turn on which sovereign's court is involved. It turns on which court has the res. Here, that is this Court. The same symmetry appears in *Kline v. Burke Construction Co.*, 260 U.S. 226 (1922), where the Court explained that where the action is *in rem*, "the effect is to draw to the federal court the possession or control, actual or potential, of the res, and the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." *Id.* at 229. That observation was made in the course of holding that no injunction was warranted as between two in personam suits, and the Court stated the converse rule in the same breath. Both halves are correct, and both point the same way here, because only one court has ever had this res. See also *Mandeville v. Canterbury*, 318 U.S. 47, 48–49 (1943) (per curiam) (stating the rule that "the court first acquiring jurisdiction or assuming control of such property is entitled to maintain and exercise its jurisdiction to the exclusion of the other," while vacating an injunction because the federal suit there was in personam and required no control of the property); *New Haven Inclusion Cases*, 399 U.S. 392, 426 (1970) (the court first acquiring possession "is vested, while it holds possession, with the power to hear and determine all controversies relating thereto") (quoting *Lion Bonding & Surety Co. v. Karatz*, 262 U.S. 77, 89 (1923)).

43. Congress wrote that principle into the bankruptcy jurisdictional statute in the most direct terms available: the district court where the case is pending "shall have exclusive jurisdiction … of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1). The Supreme Court has

confirmed what that means: "Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004). *Hood* also supplies the reason the principle is so strong in bankruptcy. Bankruptcy jurisdiction is *in rem*: "the bankruptcy court's jurisdiction is premised on the res, not on the persona." *Id.* at 450. The proceeding is, in the Court's phrase, "one against the world." *Id.* at 448. And it binds sovereigns that never appeared: "States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors." *Id.* Accord *Central Virginia Community College v. Katz*, 546 U.S. 356, 369 (2006) ("Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction."); *id.* at 378 (in ratifying the Bankruptcy Clause the States "acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts").

44. Congress made the grant deliberately comprehensive. See *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (Congress intended to "grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate") (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)); *id.* (the grant "was a distinct departure from the jurisdiction conferred under previous Acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction"). The centralizing purpose is longstanding. *Duggan v. Sansberry*, 327 U.S. 499, 510–11 & n.18 (1946) (reorganization court has "exclusive jurisdiction of the debtor and its property, wherever located," and quoting with approval *Kalb v. Feuerstein*, 308 U.S. 433, 438–39 (1940), that Congress may render judicial acts taken as to a protected debtor's person or property "nullities and vulnerable collaterally"). The estate reaches even property a creditor seized before the filing. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209 (1983). Now apply the doctrine, and the distinction that decides this Motion emerges. These authorities draw a line between a court's power to adjudicate rights in property and its power to control or disburse that property. A court without the res may do the first. It may not do the second. That line is not the Debtor's invention. It is drawn most sharply in the very cases that limit exclusivity. See *Penn General Casualty Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 198 (1935)

(exclusive jurisdiction over a res "is exclusive only so far as its exercise is necessary for the appropriate control and disposition of the property"); *United States v. Klein*, 303 U.S. 276, 281 (1938) (Klein, Escheator of Pennsylvania) (jurisdiction over property in a federal court's possession "is exclusive only in so far as restriction of the power of other courts is necessary for the federal court's appropriate control and disposition of the property"). I cite those cases because they state the limit at its strictest, and because the relief sought here satisfies it. The Debtor does not ask this Court to displace the State Court from anything that court may decide. She asks it to protect the one thing necessary to its own control and disposition of the res: that the exemption it allowed, and the distribution its Trustee made, not be undone by an order of another court commanding the money back.

45. That is why this Motion leaves the matrimonial trial alone. The State Court may decide equitable distribution. It may determine the parties' respective rights in the Powells Cove property and in every other asset. It may enter a judgment of divorce. What it may not do is order the res moved — it may not direct that the exempt proceeds this Court's Trustee disbursed be paid over to Mr. Parlionas, and it may not imprison the Debtor to compel her to do it. Adjudication is one thing; execution against the res is another. Nor does the fact that the proceeds have passed out of the estate and into the Debtor's hands change the analysis. Section 1334(e)(1) speaks of "all the property, wherever located, of the debtor as of the commencement of such case," and the Powells Cove property was exactly that on June 7, 2023. The exemption, the sale and the disbursement were the exercise of this Court's *in rem* jurisdiction over it. Cf. *The Rio Grande*, 90 U.S. at 461. Congress then provided by statute what becomes of exempt proceeds afterward: they are "not liable" for prepetition debts. 11 U.S.C. § 522(c).

46. On the consequence of proceeding anyway, the authority is squarely with the Debtor — and it answers what I can only describe as the Respondents' working assumption that the stay may be disregarded without consequence. Orders "entered in violation of an automatic stay in bankruptcy are void *ab initio* and subject to collateral attack, even if the state court has (erroneously) determined that the automatic stay does not apply to the proceeding in which the order is entered. This is precisely the holding of *Kalb v. Feuerstein*." *In re Benalcazar*, 283 B.R. 514, 526 (Bankr. N.D. Ill. 2002). *Benalcazar* is closely analogous: it held that *Rooker*-Feldman did not bar the bankruptcy court from deciding whether the stay applied,

that the stay applies to a state-court civil contempt proceeding brought by a private creditor, and that the creditor's violation was willful. See also *In re Muhlig*, 494 B.R. 755 (Bankr. S.D. Fla. 2013) (defendants' affirmative acts in obtaining a state-court judgment without notice to the Chapter 7 trustee, and thereafter seeking to enforce it, as to a cause of action that was property of the estate, violated § 362(a)(3), and the judgment was void *ab initio* to that extent).

47. I should address *City of Chicago v. Fulton*, 592 U.S. 154 (2021), which the Respondents may invoke. *Fulton* holds that the mere retention of estate property after a petition is filed does not violate § 362(a)(3), which reaches "affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed." *Id.* at 158. *Fulton* does not reach this Motion. The Debtor's claim rests on no one's passive retention of anything. It rests on §§ 362(a)(1), (a)(2) and (a)(6) — subsections *Fulton* expressly left untouched — and on a series of affirmative acts: applications for a warrant of arrest and a money judgment, a representation to the State Court that the stay had been lifted, an application to recharacterize the contempt as criminal, and a continuing demand that exempt funds be paid over. Those are affirmative acts disturbing the status quo by any measure, including *Fulton*'s own.

48. A bankruptcy court's orders are not subject to collateral attack in another forum. *Celotex*, 514 U.S. at 313 ("It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected"; a party may not "collaterally attack the Bankruptcy Court's Section 105 Injunction … without seriously undercutting the orderly process of the law"); see also *id.* at 306 ("persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order").

49. The Tenth Circuit's decision in *Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255 (10th Cir. 1989), cert. denied, 497 U.S. 1003 (1990), addresses this structural problem directly, and I respectfully commend it to the Court. It is not a bankruptcy case, and I do not offer it as one. But its reasoning about what happens when a state court decides a matter Congress has committed to an exclusive federal channel is squarely applicable, and I am aware of no better statement of the principle. In *Williams*, the Federal Energy

Regulatory Commission issued a certificate of public convenience and necessity authorizing an interstate pipeline extension. A competing local distributor, which had participated in and lost the FERC proceeding, had earlier filed what the Tenth Circuit called a "preemptive strike" in Oklahoma state court. After the federal certificate issued — and after the competitor had sought rehearing at FERC and taken an appeal to the D.C. Circuit under the Natural Gas Act's exclusive review provision — the state court decided the preemption question for itself and permanently enjoined construction and operation of the certificated pipeline. *Id.* at 258–59. The federal district court believed itself powerless. Invoking *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), it abstained, reasoning that it could not review a state court judgment and that relief lay only through the Oklahoma appellate courts. *Id.* at 259.

50. The Tenth Circuit reversed. It held that the state proceeding "constituted an impermissible collateral attack on a FERC order in contravention of § 19 of the NGA," and that "the federal district court erred in refusing to enjoin the enforcement of the state court injunction." *Id.* at 264. And it then confronted *Rooker* head-on, treating it not as an obstacle but as a principle with two ends. *Rooker*, the court explained, exists because "this dual system could not function if state and federal courts were free to fight each other for control of a particular case," and so "it was necessary to work out lines of demarcation between the two systems." *Id.* at 265 (quoting *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970), which in turn quotes *Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.*, 309 U.S. 4, 9 (1940)). The court continued:

> However, the *Rooker* "line of demarcation," and the principles of comity it represents, cannot be observed unilaterally if it is to achieve its desired effects. Just as the federal courts lack jurisdiction to review the decisions of the state courts, so also must state courts defer to the federal appellate process mandated by Congress. What is sauce for the goose is also sauce for the gander. Otherwise, the "needless friction" that *Rooker* seeks to prevent would be commonplace.
>
> . . . .
>
> Consequently, the state action crosses the *Rooker* boundary, just as a federal court exceeds its jurisdiction when it disregards the exclusivity of a state's ongoing appellate process. This court will not misuse *Rooker* to shield a state court injunction that runs afoul of the very principles of comity that lay at *Rooker*'s base.

890 F.2d at 265. The court's conclusion was that "the deference afforded the decisions of state courts under *Rooker* is not warranted where, as here, a state court has erroneously taken appellate jurisdiction over issues that have been previously decided by a federal agency, or when review of those issues could have and should have been sought pursuant to the federal statutory scheme." *Id.* at 265–66.

51. Translate the reasoning to this case and every element is present, in stronger form. There, a federal agency had decided a question; here, an Article I court, Chief Judge of the United States Bankruptcy Court of the United States has. There, Congress had channeled review of that decision into an exclusive federal appellate route; here, Congress has gone further and vested exclusive jurisdiction over the res itself in the district court where the bankruptcy case is pending, 28 U.S.C. § 1334(e)(1), and has declared by statute that the property in question "is not liable" for the debt in question, 11 U.S.C. § 522(c). There, the state court enjoined the exercise of rights conferred by a federal certificate; here, the State Court is being asked to imprison a debtor until she surrenders money a federal court declared exempt and a federal trustee paid to her. The comity point cuts the same way. The Debtor does not ask this Court to review, reverse, or sit in appeal of any judgment of the State Court, and nothing in the Motion invites that. What she asks is that this Court enforce its own orders against parties who are before it — which is exactly what *Williams* says the federal court should have done. Comity is not a one-way ratchet under which a federal court must defer to a state judgment while the state court is free to disregard an exclusive federal jurisdiction. As the Tenth Circuit put it, comity "cannot be observed unilaterally." The Ninth Circuit, sitting en banc, has applied precisely this reasoning to the automatic stay. In *Gruntz v. County of Los Angeles (In re* Gruntz*)*, 202 F.3d 1074 (9th Cir. 2000) (en banc), the court held that "the *Rooker*-Feldman doctrine is not implicated by collateral challenges to the automatic stay in bankruptcy," because "[a] bankruptcy court simply does not conduct an improper appellate review of a state court when it enforces an automatic stay that issues from its own federal statutory authority." *Id.* at 1083. On the contrary, the court explained, "a reverse *Rooker*-Feldman situation is presented when state courts decide to proceed in derogation of the stay, because it is the state court which is attempting impermissibly to modify the federal court's injunction." *Id. Gruntz* states the rule that governs here: "*Rooker*-Feldman does not allow a state court to interfere with the core

administrative functions of an operative bankruptcy. Just as federal district courts are not part of the state appellate system, neither are state courts granted supervisory or appellate jurisdiction over federal courts." *Id.* at 1084. "Any state court modification of the automatic stay would constitute an unauthorized infringement upon the bankruptcy court's jurisdiction to enforce the stay." *Id.* at 1082. And in summary: "bankruptcy courts have the ultimate authority to determine the scope of the automatic stay imposed by 11 U.S.C. § 362(a), subject to federal appellate review. A state court does not have the power to modify or dissolve the automatic stay. … Thus, if it proceeds without obtaining bankruptcy court permission, a state court risks having its final judgment declared void." *Id.* at 1087.

52. This foregoing principle is not a modern innovation of the Ninth Circuit. It is *Kalb v. Feuerstein*, 308 U.S. 433 (1940), where the Supreme Court held that a state court's foreclosure proceedings taken while a federal bankruptcy stay was in force were "not merely erroneous but … beyond its power, void, and subject to collateral attack," *id.* at 438, because "[i]f Congress has vested in the bankruptcy courts exclusive jurisdiction over … debtors and their property, … its Act is the supreme law of the land which all courts — state and federal — must observe," and "[t]he States cannot, in the exercise of control over local laws and practice, vest State courts with power to violate the supreme law of the land," *id.* at 439. *Kalb* arose under the Frazier-Lemke Act, the weaker statutory predecessor of § 362; the argument from it to the modern automatic stay runs *a fortiori*.

53. In this Circuit the consequence is settled: acts taken in violation of the stay are "void and without vitality." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994); *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987); *Eastern Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (only an order annulling the stay under § 362(d) can retroactively validate an act otherwise void *ab initio*). Any warrant, order of commitment, money judgment or turnover directive entered in the Divorce Action to collect the June 2022 fine would therefore be void, and the Debtor asks this Court to say so now rather than after she has been jailed on one.

54. I want to be precise about what this argument does and does not claim. It does not claim that the State Court lacks jurisdiction over the divorce; it plainly has it, and this Court remanded those issues to it. It does not claim that the State Court lacks power to punish contempt

committed in its presence. It claims something narrower and, I respectfully submit, unanswerable: that no court other than this one may determine whether property this Court exempted and disbursed is available to pay a prepetition claim, and that a contempt proceeding whose purge condition is the payment of those funds decides that question by another name.

55. Finally, the relief sought honors comity rather than strains it. It runs against the Respondents, who are before this Court, and not against the State Court, which is not. It asks them to do nothing except what § 362(a) has required of them since June 7, 2023 and what this Court declared in October and December 2023. And it supplies the State Court with the very thing it asked for and never received. On May 18, 2026 that court said: "I'm being told that there's no longer a stay in effect but we're going to confirm that because if there is, I would not dare lock you up." (Ex. 8, Tr. at 7:18–21.) It directed counsel to confirm. Counsel did not. An order of this Court is therefore not an intrusion upon the State Court; it is the answer to the question the State Court put and was never given.

## POINT VI — THE LEADING TREATISE CONFIRMS THAT EVERY ACT COMPLAINED OF IS STAYED

56. Because the Respondents have proceeded for more than two years as though the automatic stay were a formality that had somehow lapsed, I set out below what the standard treatise says about each step of the analysis. I rely on 3 *Collier on Bankruptcy* ¶¶ 362.01–362.13 (16th ed. 2026), and I have given the paragraph citations so the Court and the Respondents may check each proposition.

57. The breadth of the stay. Collier begins where the statute does: "The stay of section 362 is extremely broad in scope and, aside from the limited exceptions of subsection (b), applies to almost any type of formal or informal action taken against the debtor or the property of the estate. The stay applies to all entities." ¶ 362.03. "[V]irtually all acts to collect prepetition claims and all actions that would affect property of the estate are stayed." *Id.* Section 362(a)(6), in particular, "applies to any 'act' whether or not that act is related to an 'action' or a 'proceeding.' Thus, any act taken to collect, assess or recover a prepetition claim against the debtor, whether the act is taken against the estate or against the debtor, is

stayed." ¶ 362.03[8]. And "[t]he term 'act' is broadly construed to include the failure to stop actions." ¶ 362.03[8][a].

58. The purpose of § 362(a)(6) is precisely the conduct at issue here: it "is intended to prevent creditor harassment of the debtor in attempting to collect prepetition debts," and "[t]he conduct prohibited ranges from that of an informal nature, such as by telephone contact or by dunning letters, to more formal judicial and administrative proceedings that are also stayed under subsection (a)(1)." *Id.* If a dunning letter is an act to collect, a courtroom application to imprison the debtor until she pays is *a fortiori* one.

59. Civil arrest and post-judgment remedies. On § 362(a)(2), Collier is explicit: "proceedings supplementary to judgment, such as a debtor's examination or the like, are stayed. Similarly, levy of execution, restraining orders, civil arrest orders and exercise of any other postjudgment remedies are stayed." ¶ 362.03[4]. The relief the Respondents have sought — a warrant for the Debtor's arrest and commitment until she pays — is a civil arrest order in aid of a money obligation. *Collier says it is stayed.*

60. As far as the issue with now the State Court is emphasizing is the purging of the civil contempt, a prepetition debt, which the state court wants to purge with application of exempt property (Debtor had claimed and received homestead exemption disbursement). Collier addresses the homestead proceeds directly. Section 362(a)(2) "protects exempt assets that cease to be property of the estate and assets acquired after the commencement of a case." ¶ 362.03[4]. The stay "also protects individual debtors' exemption rights." ¶ 362.03[1]. Property covered by § 362(a)(5) "includes property acquired by an individual debtor after the date of the filing of the petition, exempt property, abandoned property, and property that does not become a part of the estate." ¶ 362.03[7]. And the stay of acts against property of the estate expires when the property leaves the estate, but "the stay of other acts, for example those covered by section 362(a)(5), does not expire until the granting of a discharge or the closing or dismissal of the case." ¶ 362.03[7][b]. Most directly, under the heading "Exempt Property," Collier states: "If property is returned to the debtor as exempt or abandoned, it may remain protected for some time thereafter under the stay of acts to collect prepetition claims from the debtor or against property of the debtor. In this regard, it should be noted that any exemption will continue to be effective against prepetition creditors, other than those with nondischargeable tax or domestic support obligation

claims, those with indefeasible liens, those with certain nondischargeable claims owed to a federal depository institutions regulatory agency, or those with certain claims based on student loans or assistance obtained by fraud. The exemption remains effective against the remaining prepetition creditors even if their claims are nondischargeable." ¶ 362.06[1]. This passage decides the homestead question against the Respondents twice over. Mr. Parlionas holds none of the enumerated kinds of claim. His is a property-division indemnity, not a domestic support obligation. So even if his claim were nondischargeable, the exemption "remains effective" against it — which is to say the $179,975.00 was never his to demand, and the Debtor commits no contempt by having lived on it.

61. **Contempt proceedings as collection**. Collier states the rule that governs the characterization question here: "Most courts have held that contempt proceedings which are intended to uphold the dignity of the court, rather than to coerce payment of a debt, are not stayed based on the exception in section 362(b)(1). Thus, the enforcement of an arrest warrant issued in connection with post-judgment collection proceedings generally does not fall within the exception and would be stayed under section 362(a)." ¶ 362.05[1]. The cases Collier gathers for that proposition are this case in miniature. *In re Daniels*, 316 B.R. 342 (Bankr. D. Idaho 2004) (creditor's refusal to take steps to quash an arrest warrant it had obtained in a post-judgment contempt proceeding violated the stay); *In re Goodman*, 277 B.R. 839 (Bankr. M.D. Ga. 2001) (arrest warrant issued in a contempt proceeding relating to judgment collection was stayed); *In re Galmore*, 390 B.R. 901 (Bankr. N.D. Ind. 2008) (creditor violated the stay by arranging the debtor's arrest on a bench warrant issued in a state collection action); *In re Barboza*, 211 B.R. 450 (Bankr. D.R.I. 1997); *Gray v. ZB, N.A. (In re Gray)*, 567 B.R. 841 (Bankr. W.D. Wash. 2017) (creditor violated the stay by not taking steps to quash bench warrants for the debtor's arrest). Closest of all is *In re DeSouza*, 493 B.R. 669 (B.A.P. 1st Cir. 2013), which Collier cites at ¶ 362.05[2] for the holding that a "postpetition contempt proceeding and debtor's incarceration for failure to pay alimony violated the automatic stay" — and that was an alimony case, where the creditor at least had a domestic support obligation to point to. See also *Tipton v. Adkins (In re Tipton)*, 257 B.R. 865 (Bankr. E.D. Tenn. 2000) ("state court contempt motion was in violation of stay to the extent it went beyond establishing support and sought enforcement [of] support obligations").

62. The exceptions to it are narrow, and neither fits. Collier instructs that "[t]he drafting of the exceptions is precise and intentional and must be carefully considered in light of the inclusive nature of section 362(a). Exceptions to the stay should be read narrowly." ¶ 362.05. As to § 362(b)(1), "the exception is applicable only when the proceeding is brought for the purpose of enforcing the criminal law," ¶ 362.05[1][a], and — decisively as to Ms. Coffinas's May 21 application — "section 362(b)(1) is not so broad as to except from the stay private actions of creditors that are not part of the criminal process." *Id.* Collier adds that a bankruptcy court "should exercise its equitable power to enjoin such a prosecution when the primary purpose is debt collection." *Id.*

63. As to § 362(b)(2), Collier explains that the exception reaches "the collection of a domestic support obligation … from property that is not property of the estate," and dissolution proceedings "except to the extent that the dissolution proceeding seeks to determine the division of estate property." ¶ 362.05[2]. It distinguishes a support debt from "a debt that is in the nature of a marital property settlement." *Id.* It notes that proceedings to enforce such orders "were conspicuously omitted from the exception and were stayed," and that the 2005 amendments added only a closed list of enforcement exceptions — income withholding, license suspension, credit reporting, tax-refund interception, and medical obligations — none of which is a warrant of arrest. *Id.* The rationale, Collier says, is that collection be "from property that is not part of the estate earmarked for creditors generally." *Id.*

64. The duty to speak, and the consequence of silence. On the precise conduct at issue in this Motion, Collier could hardly be clearer: "When litigation is pending against the debtor at the time a bankruptcy case is commenced, the litigation is stayed automatically. The nondebtor party has an obligation to notify the court in which the litigation is pending that the action is stayed and to take any other action necessary to assure that the action does not continue. Failure to do so violates the stay." ¶ 362.03[3]. ***Ms. Coffinas did the opposite of what that sentence requires.*** Asked by the State Court whether a stay was in effect, she said it had been lifted; undertook to confirm; and did not. The obligation Collier describes is not merely to refrain from misleading the other tribunal — it is affirmatively "to notify the court … that the action is stayed and to take any other action necessary to assure that the action does not continue." Collier states the consequence for the resulting proceedings as well: "if the nonbankruptcy court continues the action or enters a judgment notwithstanding

the imposition of the automatic stay, the action or judgment should be considered ineffective against the debtor." ¶ 362.03[3]. Nor may a court's participation be defended as merely ministerial: "the concept of purely ministerial acts should be narrowly construed to protect only those acts that are clerical in nature and do not involve the exercise of any discretion or judgment," ¶ 362.03[3][e], and Collier cites *Skillforce, Inc. v. Hafer*, 509 B.R. 523 (E.D. Va. 2014), for the proposition that continuation of a hearing requiring the debtor's personal appearance is not a ministerial act.

65. I state plainly what the Debtor does and does not draw from this. She does not ask this Court to sanction Justice Viscovich, and the Motion seeks no relief against him. What follows from ¶ 362.03[3] is (i) that any commitment, warrant or money judgment entered in the Divorce Action to collect this prepetition claim would be ineffective as against her, and (ii) that the duty to prevent that outcome rested, and rests, on the Respondents — the parties who are before this Court and who are bound by the stay.

66. **Acting at one's peril.** Collier addresses the posture the Respondents have adopted — proceeding on their own view that the stay does not apply. "In general, the nondebtor party seeking to take action against the debtor or its property is well advised to assume that the stay applies and seek relief by appropriate proceedings in the bankruptcy court." ¶ 362.03[6][b]. A creditor who instead relies on its own reading of an exception "does so at its peril." ¶ 362.02. Notice need not be formal: "A party that has received notice of the bankruptcy case, even if only oral notice, can be sanctioned for violation of the stay. If there are doubts about the veracity of the notice, it is incumbent upon the party receiving notice to determine for itself, before acting, whether a case has been filed." *Id.* Here the Respondents needed to determine nothing; they had litigated in this Court for years.

67. **Who decides.** "The bankruptcy court has exclusive jurisdiction to grant relief from the stay. A nonbankruptcy court may determine the applicability of the automatic stay with respect to litigation pending before it, but the bankruptcy court is not bound by that determination." ¶ 362.08. And "[t]he bankruptcy court has exclusive jurisdiction over sanctions for a stay violation." ¶ 362.12[3]. I note, because candor requires it, that Collier flags a contrary decision of this District, *Siskin v. Complete Aircraft Services, Inc. (In re* Siskin*)*, 258 B.R. 554 (Bankr. E.D.N.Y. 2001), as holding that a state court determination that its own order did not violate the stay binds the bankruptcy court under *Rooker-*

Feldman. ¶ 362.08 n.1a. *Siskin* is inapposite: the State Court here has made no such determination. It twice held the opposite — that this relief was "stayed by plaintiff's bankruptcy filing" (Exs. 5–6) — and its later course rested not on any ruling of its own but on counsel's representation that the stay had been lifted.

68. **Void, contempt, and the duty to undo.** Collier's conclusion on effect: "Most courts have held that actions taken in violation of the stay are void and without effect," and, expressing the treatise's own view, "it is preferable to treat any such acts as void and of no effect, subject to being given effect by annulment or modification of the stay." ¶ 362.12[1]. Retroactive annulment "should be granted only in extraordinary circumstances, such as when a creditor acted without knowledge of the stay." *Id.* No such circumstance is available to these Respondents.

69. **On remedy**: "A violation of the stay is punishable as contempt of court. Most courts will impose contempt sanctions for a knowing and willful violation of a court order, and the automatic stay is considered as equivalent to a court order. If the conduct is willful, even if based upon advice of counsel, contempt is an appropriate remedy." ¶ 362.12[2]. And on the point that answers the Respondents' two years of inaction: "the creditor has a duty to undo actions taken in violation of the automatic stay. Failure to undo a technical violation may elevate the violation to a willful one." *Id.* Even an innocent violator, Collier says, is expected to "undo the effect of its innocent action and thereafter to assert" its position as a basis for relief. ¶ 362.12[2][b]. The Respondents have undone nothing.

70. On damages, Collier records "an 'emerging consensus' that emotional distress damages may be recovered in an award of actual damages under section 362(k)(1)," ¶ 362.12[3], and that actual damages "may include an award of attorney's fees and costs," including fees "incurred in prosecuting an action to obtain full relief under the statute," *id.* Punitive damages are available "in an appropriate case." *Id.*

71. I acknowledge one qualification, which the Court would find in any event. Collier observes that *Taggart v. Lorenzen*, 587 U.S. 554 (2019), "has called into question the standard to be used to determine whether a creditor's action is willful," and that the pre-*Taggart* rule — knowledge of the filing plus an intentional act, with no specific intent or malice required — may no longer state the test. ¶ 362.12[3]. That qualification does not assist the Respondents. *Taggart*'s standard is objective, and on this record there was no fair ground of doubt: two

orders of this Court, two orders of the State Court, no stay relief ever sought, and a representation to the contrary that counsel promised to verify and never did.

**POINT VII — THE RESPONDENTS' VIOLATIONS ARE WILLFUL; CONTEMPT LIES UNDER § 105(a); DAMAGES LIE UNDER § 362(k)**

72. The stay does not merely forbid a creditor from starting something new. A creditor who has set a collection effort in motion bears an affirmative duty to stop it. "A creditor, who has put a collection effort into motion must affirmatively act to stop, stay, or hold the collection effort in abeyance or risk incurring liability once a bankruptcy commences." *Valentine v. Valentine (In re Valentine)*, 611 B.R. 622 (Bankr. E.D. Mo. 2020). Accord *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214– 15 (9th Cir. 2002) (§ 362(a)(1) "imposes an affirmative duty to discontinue post-petition collection actions"). The duty runs to the creditor and to its counsel alike: "The creditor and its agents, including its attorney, have an affirmative duty to stop the garnishment proceeding." *In re Mims*, 209 B.R. 746 (Bankr. M.D. Fla. 1997). It is not discharged by standing aside while a court officer does the collecting. *In re Webb*, No. 11-8016, 2012 WL 2329051 (B.A.P. 6th Cir. Apr. 9, 2012) ("Creditors have an affirmative duty to stop the sale from continuing once they receive actual notice of a debtor's bankruptcy filing"). And it extends to process of precisely the kind at issue here. A creditor who has caused a bench warrant to issue as a means of collecting a debt bears an affirmative duty to ask the issuing court to recall it; that duty, the court held, "should be imposed." *Galmore*, 390 B.R. 901. This Court has recently had occasion to apply that duty in a decision of its own, and its reasoning governs here. In *In re Henderson*, No. 1-08-48268-jmm, Mem. Decision on Damages for Violation of the Automatic Stay Pursuant to 11 U.S.C. § 362(k) (Bankr. E.D.N.Y. Jan. 9, 2026) (Mazer-Marino, J.), this Court held that "upon receiving actual notice of the commencement of a bankruptcy case, a creditor has an affirmative duty under § 362 to take the necessary steps to discontinue its collection activities against the debtor," quoting *Sucre v. MIC Leasing Corp. (In re Sucre)*, 226 B.R. 340, 347 (Bankr. S.D.N.Y. 1998), and that "[f]ailure to undo a technical violation may elevate the violation to a willful one," quoting *In re Miszko*, 627 B.R. 809, 819 (Bankr. S.D.N.Y. 2021). *Henderson*, slip op. at 12–13. The creditor there foreclosed one day after the petition was filed and without notice of it, so that the initial act

was technical and innocent. What made the violation willful was everything that came after: for almost five years it declined to file a corrective deed, and it neither undid the void sale promptly nor asked the bankruptcy court to annul the stay. This Court's statement of the obligation was unequivocal: "Creditor was required to vacate the referee's deed promptly or to move in this Court for an order annulling the automatic stay and validating the sale. Creditor did neither." *Id.* at 16. And the decision allocates the burden in the way that disposes of the Respondents' entire posture: "[i]t is not the debtor's responsibility to take action that ensures that she receives the protection of the automatic stay; rather the creditor bears the burden of seeking relief from the automatic stay before taking post-petition collection actions." *Id.* at 13 (quoting *In re Braught*, 307 B.R. 399, 401 (Bankr. S.D.N.Y. 2004)). The Respondents have carried none of it. In more than three years they have never asked this Court for relief from the stay, never sought annulment, and never sought a determination that the stay does not reach the June 2022 fine. They simply went on collecting.

73. *Valentine* is close to this case on its facts. A prepetition divorce obligation; a state-court contempt proceeding to coerce its payment; a debtor jailed on an order of confinement that recited no means by which he could purge; and a domestic-relations attorney who knew of the bankruptcy and let the contempt hearing go forward. The bankruptcy court held that the creditor and her counsel violated the stay, and it rejected each of the excuses offered — the same excuses I expect here.

74. It rejected counsel's plea that he was a matrimonial practitioner unfamiliar with the obligations imposed by the Bankruptcy Code, holding that he should at least have sought a continuance to acquaint himself with the law. It rejected the argument that the responsibility lay with the state judge, calling that a "red herring": "[t]he adjudications of the state court judge are not the issue before the Court. The issue is the Defendants' failure to behave in a way befitting a creditor and its agent bound by federal law to comply with the automatic stay." And it held that the duty was affirmative in both directions — counsel and the creditor on whose behalf he acted were each liable, with punitive damages imposed on counsel for failing to make any effort to learn the law or to halt the "collection train." See also *Wohleber v. Skurko (In re Wohleber)*, 596 B.R. 554 (B.A.P. 6th Cir. 2019), *appeal dismissed for lack of jurisdiction*, 833 F. App'x 634 (6th Cir. 2020) (postpetition contempt

sentencing to coerce payment of a marital property-settlement obligation violated the stay; the creditor and her counsel had a duty to prevent the sentencing and the confinement from occurring). Here, the matrimonial practitioner is working in conjunction with her client's bankruptcy attorneys.

75. I emphasize the point *Valentine* makes about the state judge, because it is the answer to the objection the Respondents are most likely to raise. The Motion does not ask this Court to sit in judgment on Justice Viscovich. What the State Court does with its own contempt power is its affair. What is before this Court is the conduct of a creditor and his lawyer who are bound by a federal injunction, who knew of it, and who — instead of standing up in the State Court and saying so — told that court the stay had been lifted.

76. This record therefore does not rest on inaction alone, though inaction would suffice. It contains an affirmative misstatement to a court about the existence of a federal stay; an express undertaking to confirm the point that was never performed; and a subsequent application to have the contempt recharacterized as criminal, which would have placed it beyond § 362(a). Each is a "deliberate act taken in violation of a stay, which the violator knows to be in existence."

77. The willfulness standard in this Circuit is met by "any deliberate act taken in violation of a stay, which the violator knows to be in existence." *Crysen/Montenay Energy Co. v. Esselen Assocs. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990); see *In re Leiba*, 529 B.R. 501, 506 (Bankr. E.D.N.Y. 2015). The Respondents' knowledge is not in question: Mr. Parlionas litigated the removal and remand, opposed and litigated in this case, and filed proofs of claim; the Coffinas Firm appeared throughout and received this Court's and the State Court's orders. Neither malice nor a specific intent to violate the stay is required. The test "is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation," and "[a] good faith belief in a right to the property is not relevant to a determination of whether the violation was willful." *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265 (1st Cir. 1999); accord *Johnson v. Smith (In re Johnson)*, 501 F.3d 1163 (10th Cir. 2007) ("no specific intent is required"); *In re Lansdale Family Restaurants, Inc.*, 977 F.2d 826 (3d Cir. 1992) (willfulness "requires that the acts which violate the stay be intentional"); *Webb*, 2012 WL 2329051 (a creditor's good-faith belief that its intentional acts did not violate the stay "is not a defense to a § 362(k) action").

Two further rules bear directly on these Respondents. Counsel's knowledge of the bankruptcy is imputed to the client. *Green Tree Servicing, LLC v. Taylor*, 369 B.R. 282 (S.D. W. Va. 2007). And where an agent commits the offending act on a principal's behalf, a court "may hold a principal and its agent jointly and severally liable for § 362(k) damages," because § 362(k) "applies with equal force to the agents and attorneys who commit the offending acts." *Gammons v. M.T.M. Development Corp. (In re Gammons)*, 2020 WL 1547154 (Bankr. D.R.I. Mar. 31, 2020). *Henderson* disposes of the excuse that a violator may have begun in good faith. The creditor there argued it had no notice of the case when it conducted the sale. This Court held the argument beside the point: "Whether Creditor had notice of the bankruptcy case prior to conducting the sale is immaterial because after Creditor learned of the sale, it failed to remedy the stay violation for approximately five years." *Henderson*, slip op. at 15. The Respondents have no such starting excuse to lose. There was never a moment of innocent ignorance here: Mr. Parlionas litigated in this Court from the outset, the Coffinas Firm appeared and was served with this Court's orders, and both were told by the State Court itself, twice, that the relief they sought was stayed. If five years of failure to remedy converts an unknowing act into a willful one, then more than three years of pressing for a debtor's imprisonment with full knowledge of the stay is willful several times over.

78. Civil contempt sanctions may be imposed where there is "no fair ground of doubt as to whether the order barred the creditor's conduct." *Taggart*, 587 U.S. at 559. The Second Circuit has applied that standard to contempt for violation of the automatic stay. *Windstream Holdings, Inc. v. Charter Commc'ns Operating, LLC (In re* Windstream *Holdings, Inc.)*, 105 F.4th 488 (2d Cir. 2024). I raise *Windstream* because it is the governing standard and the Respondents will invoke it; it does not help them. This Court applied that framework as recently as January of this year in *Henderson*, finding a willful and "egregious" violation on facts in which the creditor at least had the benefit of an initially unknowing act. Slip op. at 16.

79. In *Windstream* the question was whether an aggressive customer-solicitation campaign amounted to an exercise of control over estate property — a genuinely debatable question on which reasonable lawyers differed. Here there is nothing to debate. This Court entered two orders declaring the stay in effect as to enforcement of claims adjudicated in the

Divorce Action. The State Court entered two orders denying these Respondents this relief as stayed by the bankruptcy filing. No relief from stay was ever sought or obtained. And the Respondents' counsel, asked point-blank whether a stay was in effect, said she would confirm and did not. A party who is told by two courts that the stay bars the relief he seeks has no fair ground of doubt. *Henderson* closes what little space remains. This Court there worked through the creditor's justifications and rejected each: the creditor "provided no legal authority for its assertion" that it was disabled from correcting the violation, and "offered no explanation why it failed to move in bankruptcy court for relief from stay" to do the very thing it said it could not do. Slip op. at 15–16. This Court further held that retroactive annulment — the only lawful route by which what the Respondents have done could ever be validated — is "afforded only to innocent mortgagees that request relief promptly and otherwise would be entitled to stay relief," and is not available to a party that knew of the bankruptcy case. *Id.* at 13 (citing *In re Crichlow*, 666 B.R. 441, 460 (Bankr. E.D.N.Y. 2024); *In re Ebadi*, 448 B.R. 308, 319 (Bankr. E.D.N.Y. 2011)). The Respondents are neither innocent nor prompt. Nor may they answer that the Debtor should have come here sooner. In *Henderson* the creditor pleaded laches against a § 362(k) claim first pressed some thirteen years after the violation, and this Court rejected the defense, holding that "[t]he mere passage of time is insufficient to establish the defense of laches" and that the creditor had failed to carry its burden of showing prejudice. *Id.* at 16–17 (citing *Cohen v. Treuhold Capital Group, LLC (In re Cohen)*, 422 B.R. 350, 382 (E.D.N.Y. 2010); *In re Arana*, 456 B.R. 161, 174 (Bankr. E.D.N.Y. 2011)). The Debtor has moved while the threat is live.

80. Under 11 U.S.C. § 362(k)(1), an individual injured by a willful violation of the stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Actual damages here include the fees and costs of resisting the enforcement campaign in the Divorce Action and of bringing this Motion, together with damages for emotional distress, as to which the Andreone Affidavit and the Parlionas Affidavit make the required showing, set out below. The section reaches modest injuries as well as large ones: the cost of a trip to a lawyer's office is "actual damages," *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1 (B.A.P. 9th Cir. 2002), and so are wages lost in attending court and the fees of counsel, *California Coast*

*University v. Aleckna (In re Aleckna)*, 13 F.4th 337 (3d Cir. 2021). The fee recovery is not confined to the work of stopping the violation. Section 362(k)(1) "specifically departs from the American Rule and authorizes costs and attorneys' fees incurred by the debtor in ending a willful violation of an automatic stay, prosecuting a damages violation, and defending those judgments on appeal." *Mantiply v. Horne (In re Horne)*, 876 F.3d 1076 (11th Cir. 2017); accord *America's Servicing Co. v. Schwartz-Tallard (In re Schwartz-Tallard)*, 803 F.3d 1095 (9th Cir. 2015) (en banc) (overruling *Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2010)); *Easley v. Collection Service of Nevada*, 910 F.3d 1286 (9th Cir. 2018) (fees incurred on appeal in successfully challenging an inadequate award); *Young v. Repine (In re Repine)*, 536 F.3d 512 (5th Cir. 2008) (fees incurred in prosecuting the § 362(k) action itself). And once a willful violation is shown the debtor must be afforded the opportunity to prove damages, because it "would be impossible for a court to set the amount of actual damages, costs, and attorneys' fees without taking evidence." *Vázquez Laboy v. Doral Mortgage Corp. (In re Vázquez Laboy)*, 647 F.3d 367 (1st Cir. 2011). The Debtor requests that the Court determine liability now and set damages for a further evidentiary hearing. *Henderson* confirms both the reach of that recovery and the procedure this Court expects to be followed to obtain it. This Court there awarded, as compensatory damages, the fees and costs the debtor incurred in the state court proceedings caused by the violation, and directed that the fees and costs of litigating the § 362(k) claim itself be sought by motion under Bankruptcy Rule 7054 and Fed. R. Civ. P. 54(d)(2), filed within fourteen days of entry of the decision on no less than twenty-one days' notice. Slip op. at 25–28, 35 (citing *In re Salov*, 510 B.R. 720, 734–35 (Bankr. S.D.N.Y. 2014); *Gates v. RAC Acceptance Texas, LLC (In re Gates)*, 621 B.R. 129, 141 (Bankr. W.D. Tex. 2020)). This Court also cautioned that a fee request first "lob[bed]" into a post-trial brief is "ill-considered," because it deprives the adverse party of discovery into the fees claimed, and that the better practice is to alert the court and the adverse party before the close of evidence. *Id.* at 28 n.3. The Debtor takes that instruction now rather than later, and gives notice in this Memorandum that she will seek her fees and costs for prosecuting this Motion as part of her actual damages under § 362(k)(1).

81. Emotional-distress damages are recoverable as actual damages under § 362(k)(1). Collier records "an 'emerging consensus'" to that effect, ¶ 362.12[3], and the courts of appeals that

have addressed it agree. *Lansaw v. Zokaites (In re Lansaw)*, 853 F.3d 657 (3d Cir. 2017); *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263 (11th Cir. 2014) (recoverable where "a causal connection between the significant emotional distress and the violation of the automatic stay is clearly established"); *Dawson v. Washington Mutual Bank (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004). See also *Kaneb*, 196 F.3d 265 (affirming a $25,000 award). Corroborating medical evidence is not a precondition. The Third Circuit declined "to adopt a bright-line rule requiring such evidence to prove emotional-distress damages under § 362(k)(1)," holding that "at least where a stay violation is patently egregious, a claimant's credible testimony alone can be sufficient to support an award." *Lansaw*, 853 F.3d 657. That matters here, because Ms. Andreone is scrupulous in disclaiming any medical opinion. The Debtor must be given the opportunity to put that evidence on. *In re Rijos*, 263 B.R. 382 (B.A.P. 1st Cir. 2001). I state the contrary authority, because candor requires it. The Seventh Circuit has held that emotional injury is not compensable "when there is no financial loss to hitch it to," *Aiello v. Providian Financial Corp. (In re Aiello)*, 239 F.3d 876 (7th Cir. 2001), and the Fifth Circuit, sharing that caution, has vacated an emotional-injury award resting on "generalized assertions" rather than "specific information," *Repine*, 536 F.3d 512. Neither reaches this case. The Debtor's financial loss is established — the fees and costs of resisting the enforcement campaign and of bringing this Motion — and the Andreone and Parlionas Affidavits supply dated, observed particulars rather than generalities. A decision on facts close to these makes the point concrete. In *In re McLaughlin*, No. 07-04375, 2007 WL 3229166 (Bankr. D. Ariz. Oct. 30, 2007), a creditor threatened to have the debtor "incarcerated, 'for a Class 6 felony,'" and to bring criminal charges against him; the debtors petitioned because of "the fear [of] incarceration"; and the creditor went on calling after notice of the case. The court held that "a Court may award emotional distress damages without requiring the debtor to present medical affidavits or receipts," so long as the damages are proven and the court finds "a causal connection between the emotional harm and the stay violation" — and it drew that rule from the two decisions on which the Debtor already relies, *Dawson*, 390 F.3d at 1150–51, and *Eskanos & Adler*, 309 F.3d 1210. On testimony alone the court found chest and abdominal pains that kept the debtor from work, an inability to concentrate that cost him a supervisory position, panic attacks, and a spouse who could not concentrate at her job

or at her studies because she was "so worried … that her husband would be arrested." It awarded each debtor $3,000 for emotional distress, and $480 for wages lost in attending hearings, preparing pleadings, confirming that criminal charges had not been filed, and staying away from work "due to stress-induced physical malaise." Each of those categories has its counterpart in the affidavits before this Court, with this difference: the threatened incarceration in *McLaughlin* never happened, and the Debtor has already served time. *Henderson* is directly in point, and on this record it is *a fortiori*. This Court there held that "[s]ignificant emotional harm must be established by corroborating evidence, or may be presumed where the circumstances surrounding the violation are sufficiently egregious," slip op. at 28 (quoting *In re Voll*, 512 B.R. 132, 138 (Bankr. N.D.N.Y. 2014)), and that "[a] plaintiff's credible testimony may be sufficient evidence to establish a debtor's entitlement to damages for emotional distress," *id.* (citing *In re Laskaratos*, 605 B.R. 282, 311 (Bankr. E.D.N.Y. 2019)). The creditor there made both of the arguments the Respondents are likely to make. It argued that the debtor's distress had other causes — his tours in Iraq, his service as a September 11 first responder, the collapse of his marriage — and it argued that he had "failed to demonstrate any adverse medical determinations." *Id.* at 30. This Court rejected both in a single passage: "The Debtor testified credibly as to the adverse impact on his life and his health and Creditor has not produced evidence to the contrary. Further, the Creditor's violation of the automatic stay lasted years and is sufficiently egregious for the Court to presume the Debtor's distress." *Id.* On causation it adopted the rule of *In re Dawson*, 346 B.R. 503, 511–12 (Bankr. N.D. Cal. 2006): a debtor "is not required to prove that the [creditor's] stay violation was the sole cause of [the debtor's] emotional distress. Causation requires only proof that the offending conduct was a substantial factor." *Id.* That is exactly the showing the Andreone Affidavit makes, and it makes it in the conservative direction — setting the eleven-year divorce and the February 2023 head injury to one side as matters she "would not attribute … to anything that happened this year," and confining her account to what changed. This Court then awarded $252,000 for emotional distress, computed at approximately $131.59 per day for the 1,915 days during which the creditor left title standing in its own name. *Id.* at 31. The comparison does not favor the Respondents. The *Henderson* debtor was never jailed; what he suffered was the loss of title to a house, the collateral consequences of that loss, and the knowledge that his debt was

growing. This Debtor has been imprisoned once; has been told from the bench that she may be imprisoned again for three to four months, and returned to jail repeatedly until money is produced; and has been living, day by day, in the interval between those statements and their execution. If a cloud on title maintained for five years is "sufficiently egregious" to presume distress and to justify a per-diem award, then a campaign of more than three years to imprison a debtor for a stayed prepetition claim, out of exempt money Congress declared not liable for it, is not less so.

82. The causal showing here is made by a witness who is in the best position to make it and who is conspicuously careful about the limits of what she says. Evangelia Andreone is the Debtor's daughter. The Debtor has lived with her since her house was sold; she sees her mother every day and is "who she comes home to after court." (Andreone Aff. ¶ 3.)

83. Ms. Andreone separates what is attributable to this year from what is not, and does so against her own interest as an advocate for her mother. The eleven-year divorce "had worn her down long before 2026"; her difficulty concentrating dates to a February 2023 head injury; and Ms. Andreone states expressly, "I would not attribute either of those to anything that happened this year." (*Id.* ¶ 24.) What is different, she says, "is not more of the same": "The vomiting started after Rikers. The waking up at night started after Rikers. She went and found a therapist right after Rikers. Before that she was worn down but she still worked on her case. She does not now." (*Id.* ¶ 25.) And she identifies the cause with precision: the fear "is not worry over how the divorce will come out. It is the contempt, and the possibility of going back to jail over it." (*Id.* ¶ 26.)

84. The observed harm is continuing and is tied to the threat rather than to the past. The Debtor "talks about going back to jail almost constantly"; on court days she "comes home and cannot do anything else"; and "jailing her keeps coming up, including at appearances that have nothing to do with any contempt." (*Id.* ¶¶ 19–20.) Because it has happened once, "she no longer believes it is unlikely. I wish I could tell her she is worrying over nothing, but I cannot, because last time she was right." (*Id.* ¶ 21.) She is seeing Amanda Drapkin, LMSW. (*Id.* ¶ 27.)

85. Ms. Andreone is careful to disclaim more than she needs. She states that she is not a doctor and offers no medical opinion (*id.* ¶ 4); that she was not in the courtroom on May 27, 2026 and will not guess at what she did not see (*id.* ¶¶ 9–10); that her mother "is intelligent and

capable," "runs her own household and handles her own affairs," and that she is "not suggesting to this Court that she is incompetent" and seeks no appointment for her (*id.* ¶ 28). Her point is narrower and, for present purposes, exact: the Debtor "is frightened to the point where she cannot make use of what she has," and this "would ease if the threat of jail were lifted from her." (*Id.* ¶ 29.) That is a description of an injury this Court can remedy.

86. The Debtor's own affidavit supplies the first-hand account. She spent "more than eighteen hours a day locked inside my cell," in a four-bed cell with no one else in it, "no television, nothing to read, nothing to do, and no one to speak with," walking "in circles around the cell, over and over, because I needed something to do." (Parlionas Aff. ¶¶ 52–53.) At times she was not given water and was overlooked at commissary. (*Id.* ¶ 56.) "The isolation was the hardest part of it." (*Id.* ¶ 57.) Since her release she cannot sleep; when she does, she hears "the cell door closing again." (*Id.* ¶ 59.) She "now feel[s] real anxiety when I enter that courtroom," and "sometimes walk[s] in wondering whether I will walk back out" — while being expected "at the same time to try a complicated financial case by myself." (*Id.* ¶ 63.)

87. She also states the aggravating fact that distinguishes a past injury from a continuing one: at the August 10, 2026 appearance the State Court stated in substance that a future incarceration would be for three to four months, and that it would return her to jail repeatedly until the money is produced. (*Id.* ¶ 61.) "I have already been incarcerated once. So when I hear that I can be incarcerated again, I cannot tell myself that it will not happen. It has happened." (*Id.* ¶ 60.)

88. Punitive damages are available "in an appropriate case." 3 *Collier on Bankruptcy* ¶ 362.12[3]. They have been imposed on counsel personally. In *In re Timbs*, 178 B.R. 989 (Bankr. E.D. Tenn. 1994), an attorney who "deliberately chose to take no action to stop the garnishment which he had put in place" was held liable for $5,000 in punitive damages, and the court rejected his plea that he "in good faith did not understand the law," observing that "the courts are unanimous" that a good-faith mistake of law does not relieve a willful violator of the consequences of his act. And in *Repine* the Fifth Circuit sustained a punitive award against a creditor's attorney who opposed the debtor's release from jail "because she was concerned that her fees would not be paid," and who "threatened that she would not 'appear in court to submit' an agreed order releasing [the debtor] from jail … until she

received 'a copy of the certified checks' for her attorney's fees." That conduct, the court held, "was egregious." 536 F.3d 512. A ratio of nine to one between punitive and compensatory damages has been held not excessive in this setting. *Varela v. Ocasio (In re Ocasio)*, 272 B.R. 809, 820 (B.A.P. 1st Cir. 2002). The Debtor respectfully submits that a case in which counsel told a court that a federal stay had been lifted, undertook to confirm the point and did not, and thereafter sought to have the debtor adjudicated in criminal contempt, is such a case. The Debtor requests that the Court determine liability now and set damages for a further evidentiary hearing. This Court's own recent measure is *Henderson*, and the analysis there tracks this record at every point. This Court awarded $1,308,000 in punitive damages — four times the actual damages — applying the factors of *In re Jean-Francois*, 532 B.R. 449, 459 (Bankr. E.D.N.Y. 2015): "the nature of the creditor's conduct, the creditor's ability to pay, the motives of the creditor, any provocation by the debtor, and the creditor's level of sophistication," with the amount set at what "is needed to deter future stay violations of this kind," *id.* at 460. Slip op. at 32–34. The conduct that drew that award is described in terms that fit the Respondents precisely: a refusal "to remediate its stay violation for over four years to coerce the Debtor to settle his claims." *Id.* at 34. Coercion is the common thread; the difference is the instrument. There it was a clouded title held hostage. Here it is a jail cell. *Henderson* also forecloses the defense the Respondents are most likely to raise — that the Debtor brought this upon herself by litigating. This Court held that "none of Debtor's refusal to settle, his continuation of State Court litigation, nor his bankruptcy cases constitute provocation. Rather, the Debtor's actions were reactions to Creditor's continued stay violation." *Id.* The Debtor's opposition in the Divorce Action, her removal and remand litigation, and this Motion are reactions in the same sense, and to the same thing. As to sophistication, this Court presumed it from the creditor's status as a national financial institution and noted that the creditor "did not introduce evidence to the contrary"; here the Respondents include a law firm that appeared in this Court, litigated a removed adversary proceeding to remand, and received this Court's orders declaring the stay in effect. Finally, *Henderson* confirms that the award is not tethered to a mechanical multiple of compensatory damages: "where actual damages are low, the ratio of actual damages to punitive damages has less significance because a simple multiple of actual damages would utterly fail to serve the traditional purposes underlying an award of punitive

damages, which are to punish and deter." *Id.* at 33 (quoting *In re Franklin*, 614 B.R. 534, 550 (Bankr. M.D.N.C. 2020)); see *Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289 (4th Cir. 1986) (affirming punitive damages of approximately twenty-eight times compensatory damages).

## POINT VIII — INJUNCTIVE RELIEF IS NECESSARY AND IS NARROWLY DRAWN

89. Imprisonment is the paradigm of irreparable injury. It cannot be undone and it cannot be compensated. Each day of it is lost. That is why the Debtor asks not only for a declaration and for contempt, but for an order restraining the Respondents from continuing to seek it.

90. The restraint sought is modest. It requires the Respondents to do only what the Bankruptcy Code has required of them for more than three years. It does not restrain the State Court. It does not stop the trial. It does not touch the dissolution, equitable distribution, or any domestic support obligation. It stops one thing: a private creditor and his lawyer asking a court to jail a debtor until she pays a prepetition claim out of exempt money she no longer has. *Henderson* confirms that this Court may grant relief of exactly this character, and that it may do so even where the moving papers are framed principally in damages. This Court there enjoined the creditor "from seeking, enforcing, or collecting interest, fees, costs, or charges on the Note or Mortgage that accrued on and after" the date of the violation, holding that "this injunctive relief is necessary to restore the Debtor to the status quo ante," and grounding its authority to grant relief not demanded in the pleadings on Fed. R. Civ. P. 54(c). Slip op. at 24 (citing *F&M Schaefer Corp. v. Electronic Data Systems Corp.*, 430 F. Supp. 988, 993 (S.D.N.Y. 1977), *aff'd*, 614 F.2d 1286 (2d Cir. 1979)). This Court then did on the comity question what the Debtor asks it to do here: it retained jurisdiction to fix what the creditor could lawfully collect, expressly "concurrent with the State Court," and left the state foreclosure to go forward within those federal limits. *Id.* at 34. The order sought here is the same in structure and narrower in reach. It fixes what the Respondents may not do — seek the Debtor's incarceration to collect a stayed prepetition claim out of exempt proceeds — and leaves the Divorce Action in every other respect to the State Court.

91. That the threat is present rather than historical is established by a disinterested witness. On August 11, 2026 the State Court told the Debtor she "could be locked up in relation to a civil contempt order"; on August 12 it warned her again that she could be locked up,

including with respect to the preservation of assets; on August 17 it said she "is getting closer to getting locked up," referred to her being "held in contempt of $180,000," and told her "please please please meet with your lawyer to find $180,000"; and on August 18 it said her contempt "may be active," that she "may be locked up on Monday, August 24, 2026," that "there is a chance that you will be locked up," and advised her not to bring anything of value with her. (Mohammed Aff. ¶¶ 6, 9, 12–13, 17–18.)

92. Ms. Mohammed is a stranger to both proceedings. She states that she is not a party to the bankruptcy case or to the matrimonial action, has no financial interest in either, attended as a member of the public seated in the gallery, took contemporaneous notes at or near the time of the events, retains those notes, and is prepared to produce them and to testify. She adds that no person offered her anything of value for her affidavit and no person told her what to say in it. (Mohammed Aff. ¶¶ 1–4, 19–20.)

## POINT IX — THE CHARACTERIZATION OF THE 2018 TRANSFER IS PENDING IN THIS COURT, IN THE TRUSTEE'S OWN ADVERSARY PROCEEDING; ON EITHER CHARACTERIZATION THE STATE COURT MAY NOT EXTRACT ITS VALUE, AND ON NEITHER MAY THE DEBTOR BE IMPRISONED

93. There is one fact bearing on this Motion that has not yet been stated, and I state it now because it disposes of a good deal. The 2018 transfer for which the State Court proposes to imprison the Debtor is, at this moment, the subject of a pending adversary proceeding in this Court, brought by this Court's own Chapter 7 Trustee, against the transferee. On March 8, 2025 Debra Kramer, solely as Chapter 7 Trustee of the Debtor's estate, filed her complaint against Evangelia Andreone. *Kramer v. Andreone*, Adv. Pro. No. 25-01022-jmm [ECF No. 1] (the "Trustee's Action"). It is pending before this Court now.

94. The overlap between the two proceedings is not approximate. It is exact, item for item. The Trustee pleads the same transfer — the Debtor's remaining 25% interest in YOYO Lip Gloss, Inc., conveyed to her daughter on or about October 1, 2018 (Trustee's Compl. ¶¶ 28–31); the same valuation — $252,500.00, which is the figure at which the June 2022 fine was set (*id.* ¶¶ 1, 33); the same transferee (*id.* ¶¶ 12, 45); and the same allegations, drawn expressly from the June 21, 2022 Contempt Order, which the Trustee annexes to her complaint as Exhibit A and quotes at length (*id.* ¶¶ 3–4, 33–36, 46, 72–73). The State Court

and this Court are being asked about the same conveyance of the same shares by the same family, and the value at stake is the same $252,500.00 in both.

95. **Before going further I state the Debtor's own position, so that nothing that follows is mistaken for a concession.** The Debtor does not agree that the October 2018 transfer was a fraudulent conveyance, and she does not agree that the Trustee's claims are well founded. Her position is that this dispute has always been an equitable distribution dispute — the division of marital property under Domestic Relations Law § 236(B) — and that New York channels a violation of the matrimonial automatic orders into the matrimonial court's own remedies rather than into an avoidance action. She intends to move to dismiss the Trustee's Action on that and other grounds, and she reserves every argument available to her there. She raises the Trustee's Action in this Motion not to endorse it, but because its existence — whatever its ultimate merit — settles the question of **forum**. Everything that follows in this Point is therefore stated in the alternative, and expressly without prejudice to the Debtor's position in Adv. Pro. No. 25-01022-jmm.

96. The structure of the argument is simple. There are only two characterizations of the 2018 transfer available to anyone in this dispute. Both of them lead away from the State Court, and neither of them leads to a jail cell.

97. **First — the Debtor's characterization: equitable distribution.** If the obligation is what the Debtor says it is, then it is a property-division obligation of the kind described in 11 U.S.C. § 523(a)(15), and three things follow, each already established above. Its coercive collection is stayed by § 362(a)(1), (a)(2) and (a)(6), and § 362(b)(2) does not except it, because it is not a domestic support obligation within § 101(14A) (Point II). The Debtor's exempt homestead proceeds are "not liable" for it, because § 522(c) says so and a debt of the kind described in § 523(a)(15) is not among that section's exceptions (Point III). And New York's own remedies for a violation of the automatic orders, DRL § 236(B)(2)(b) and 22 NYCRR § 202.16-a, run through the matrimonial court's contempt power and through the distributive award itself — DRL § 236(B)(5)(d) directs the court to weigh a transfer made in contemplation of a matrimonial action without fair consideration, and the wasteful dissipation of assets, in fixing equitable distribution. They do not run through a money purge payable to the other spouse and collected out of a federally exempt fund on pain of

imprisonment. On this characterization — the Debtor's own — she is entitled to the relief this Motion seeks without more.

98. *_Second — assuming_ arguendo_, and contrary to the position the Debtor will press in the Trustee's Action, the Trustee's characterization: fraudulent conveyance. If the 2018 transfer is avoidable, then the claim to avoid it is not Mr. Parlionas's, and it is not the State Court's. The avoidance powers are conferred on "the trustee," 11 U.S.C. § 544(b)(1); what is recovered is recovered "for the benefit of the estate,"_ id.* § 550(a); § 541(a)(3) makes "[a]ny interest in property that the trustee recovers under section … 550" property of the estate; and § 323(b) makes the trustee the estate's representative with capacity to sue. The Trustee pleads precisely that basis. (Trustee's Compl. ¶¶ 9, 11.)

99. **Colonial Realty.** The Second Circuit has held that an action by a creditor against a transferee to reach property fraudulently conveyed by a debtor in bankruptcy is stayed by § 362(a)(1). _FDIC v. Hirsch (In re Colonial Realty Co.)_, 980 F.2d 125, 131–32 (2d Cir. 1992). "[A] third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)." _Id._ at 131–32. The reason, in the language the court adopted from _In re Saunders_, 101 B.R. 303, 305–06 (Bankr. N.D. Fla. 1989), is that "[a]bsent a claim against the debtor, there is no independent basis for the action against the transferee." _Id._ at 132. I give the Court the qualification along with the holding: the panel did not adopt the view that fraudulently transferred property is property of the estate under § 541(a)(1) before it is recovered, and reached the stay through § 362(a)(1) instead. _Id._ at 131. The distinction does not matter here; on either route the Respondents were obliged to come to this Court before proceeding elsewhere.

100. What _Colonial Realty_ enforced shows how strong the rule is. The party held to the stay there was the Federal Deposit Insurance Corporation, suing as receiver of five failed banks under an express federal grant that Congress had declared "superior to any rights of a trustee … under title 11." 12 U.S.C. § 1821(d)(17)(D). The Second Circuit declined to infer any implied partial repeal of § 362 and affirmed a § 105 injunction restraining the FDIC from "commencing or continuing litigation in any forum other than the bankruptcy court to obtain property of the bankruptcy estate without first complying with § 362." 980 F.2d at 127, 132–35. If the FDIC, armed with a statute of superiority, must come to the bankruptcy

court first, a private matrimonial litigant holding a scheduled unsecured claim must do so too. And the court said why: the stay exists "to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts," and to "prevent conflicting judgments from different courts." *Id.* at 133 (quoting *In re Fidelity Mortgage Investors*, 550 F.2d 47, 55 (2d Cir. 1976)).

101. On this alternative characterization Mr. Parlionas would also lack standing to pursue the claim himself. "If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989). The Second Circuit applied that rule to a claim asserted against a transferee rather than against the debtor, and the passage fits this case exactly: "Although the claims raised by PepsiCo are not against the debtor but are against a third party, the same reasoning applies. The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors." *Id.* His remedy on account of the 2018 transfer would be the remedy the Code gives every creditor — a distribution from what the Trustee recovers, under 11 U.S.C. § 726 and subject to § 502(d). It would not be a purge condition payable to him personally on pain of the Debtor's imprisonment.

102. The Debtor has held one position throughout, and it is the position she will press in the Trustee's Action. The inconsistency in this record is not hers. Mr. Parlionas has filed proofs of claim in this case. If the Trustee prevails on the characterization the Debtor disputes, he shares under § 726 in whatever the Trustee recovers from his own daughter on account of this very transfer. He therefore stands to take the benefit of the fraudulent-conveyance characterization in this Court while pressing the matrimonial-contempt characterization in the State Court, and asking a state judge to jail the Debtor until she pays him the same $252,500.00 personally. He cannot have the transfer be an estate asset for purposes of his distribution and a private debt for purposes of her incarceration.

103. Nor is the risk of double payment theoretical. If the State Court compels the Debtor to pay $180,000 to Mr. Parlionas on account of the 2018 transfer while the Trustee recovers $252,500.00 from the transferee on account of the same transfer, one conveyance will have been paid for twice, and one creditor will have been paid ahead of every other, outside the

distribution scheme, by means of a threat of incarceration the Code does not permit him to make. That is the "conflicting judgments" problem *Fidelity Mortgage* names, arriving on schedule.

104. There is a further and concrete interference. On August 18, 2026 the State Court gave the Debtor thirty days "either to restore the shares or to place money in escrow." (Mohammed Aff. ¶ 18.) Those are the same shares the Trustee is suing to recover, and what she recovers becomes property of the estate under § 541(a)(3). Whatever label is put on such a directive, it places a second court in the position of ordering the disposition of the identical asset that this Court's Trustee is presently litigating, and of ordering it for the benefit of one creditor rather than the estate. Section 1334(e)(1) commits that subject to this Court alone (Point V), and § 704(a)(1) commits its administration to the Trustee.

105. I anticipate the answer that state and federal courts may proceed side by side, and I state that rule fairly, because it is the rule. As a general matter "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction," and the federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). Deference to a parallel state proceeding is confined to "exceptional circumstances," and "only the clearest of justifications" will support it. *Id.* at 813, 818–19. Abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is narrower still. It reaches only ongoing state criminal prosecutions, civil enforcement proceedings akin to criminal prosecutions brought by the State, and civil proceedings involving orders uniquely in furtherance of the state courts' ability to perform their judicial functions; and "abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73, 78 (2013). None of the three categories is present: the State Court twice declared this contempt civil and not criminal (Ex. 12, Tr. at 5:8–9, 9:20–21); no sovereign is prosecuting anything; and the moving party is a private litigant seeking money for himself.

106. But that body of doctrine presupposes the one thing this case lacks — concurrent jurisdiction. It tells a court that *has* jurisdiction when it may decline to use it. It has nothing to say where Congress has made the federal jurisdiction exclusive. Here it is exclusive

twice over. Section 1334(e)(1) gives the district court in which the case is pending exclusive jurisdiction over the property of the debtor as of the commencement of the case and over property of the estate (Point V). And proceedings to determine, avoid and recover fraudulent conveyances are core proceedings, 28 U.S.C. § 157(b)(2)(H), committed by §§ 544 and 550 to the trustee alone. Where the jurisdiction is exclusive there is no parallelism to tolerate; there is one forum. Even on the *Colorado River* factors themselves, the first is "the assumption by either court of jurisdiction over a res," 424 U.S. at 818, which points to this Court for the reasons given in Point V; and the older rule from which those factors descend is that as between two courts each of which would need control of the same property, "the jurisdiction of the one court must yield to that of the other." *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939); see ¶¶ 40–42, *supra*.

107. Two closing points, stated before the Respondents state them. First, the Anti-Injunction Act, 28 U.S.C. § 2283, is no obstacle. It permits an injunction "expressly authorized by Act of Congress," and § 362(a) is such authorization — it is a statutory injunction, which this Court enforces under § 105(a). *Colonial Realty* is the demonstration: the § 105 injunction affirmed there restrained the continuation of a non-bankruptcy action to reach fraudulently transferred property. 980 F.2d at 127, 135–37. I do not rest on the circumstance that the order the Debtor seeks runs against the Respondents rather than against the State Court; *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 287 (1970), teaches that the Act may not be evaded by addressing an injunction to the parties. I rest on the exception, which applies on its face. Second, nothing in this Point asks this Court to decide the characterization question, to interfere with the matrimonial trial, or to disturb the State Court's control of its own docket, for the reasons already given at ¶¶ 45, 54–55 and 75. It asks only that the characterization be decided in the one forum Congress designated, and that no one be jailed while that question remains open.

## CONCLUSION

108. For the foregoing reasons, the Debtor respectfully requests that the Court grant the Motion in all respects: declare and confirm that the automatic stay is and has at all relevant times been in effect; determine that the June 2022 fine is a prepetition claim whose collection is stayed and that the Debtor's exempt homestead proceeds are not liable for it; hold the

Respondents in civil contempt; restrain them from further seeking, supporting or accepting the benefit of any warrant, commitment, money judgment or other act to collect that claim; declare void all acts taken in violation of the stay; award the Debtor her actual damages, costs and attorneys' fees and, in the Court's discretion, punitive damages under 11 U.S.C. § 362(k)(1); and grant such other and further relief as is just and proper.

Dated: August 21, 2026
New York, New York


DAHIYA LAW OFFICES LLC
*/s/ Karamvir Dahiya*
Karamvir Dahiya, Esq.
111 John Street, Suite 1860
New York, New York 10038
Tel.: (212) 766-8000
Email: karam@dahiya.law
Attorneys for the Debtor